NOT DESIGNATED FOR PUBLICATION

No. 123,023

IN THE COURT OF APPEALS OF THE STATE OF KANSAS

SIERRA CLUB,
*Petitioner/Appellee*,

v.

JANET STANEK, in her Official Capacity as Secretary of the Kansas Department of Health
and Environment, and the DEPARTMENT OF HEALTH AND ENVIRONMENT, an Agency of
the State of Kansas,
*Respondents/Appellees*,

and

HUSKY HOGS, L.L.C., PRAIRIE DOG PORK, L.L.C., ROLLING HILLS PORK, L.L.C., and
STILLWATER SWINE, L.L.C.,
*Intervenors/Appellants*.

MEMORANDUM OPINION

Appeal from Shawnee District Court; RICHARD D. ANDERSON, judge. Opinion filed April 1,
2022. Reversed and remanded with directions.

*David M. Traster*, *Gary L. Ayers*, and *Clayton J. Kaiser*, of Foulston Siefkin LLP, of Wichita, for
intervenors/appellants.

*Timothy J. Laughlin*, of Long & Robinson, LLC, of Kansas City, Missouri, and *Robert V. Eye*, of
Robert V. Eye Law Office, LLC, of Lawrence, for petitioner/appellee Sierra Club.

*M.J. Willoughby*, assistant attorney general, *Arthur S. Chalmers*, assistant attorney general, and
*Derek Schmidt*, attorney general, for respondents/appellees Kansas Department of Health and
Environment and Janet Stanek.

Before CLINE, P.J., GREEN, J., and PATRICK D. MCANANY, S.J.

1

PER CURIAM: The Kansas Department of Health and Environment (KDHE) granted four swine facility permits, respectively, to Husky Hogs, L.L.C., Prairie Dog Pork, L.L.C., Rolling Hills Pork, L.L.C., and Stillwater Swine, L.L.C. (collectively Permittees) over Sierra Club's objection. Sierra Club petitioned the district court for review under the Kansas Judicial Review Act (KJRA), claiming KDHE misinterpreted the relevant statutes and regulations. The district court agreed and reversed KDHE's decision.

Permittees appealed to this court and pursued modified permits from KDHE to continue operations. Sierra Club again objected to these applications. KDHE ultimately issued the modified permits, and Sierra Club filed a second KJRA action in February 2022 challenging the modified permits.

The parties to this appeal—Permittees, Sierra Club, and KDHE—raise several arguments pertaining to jurisdiction over remand orders, mootness, standing, and statutory interpretation. We need not reach all these issues because we find Sierra Club lacked standing to petition for judicial review. We reverse the district court's decision on standing and remand with directions to dismiss Sierra Club's KJRA petition and reinstate the original permits.

*Husky Hogs, L.L.C. and Prairie Dog Pork, L.L.C.*

Husky Hogs, L.L.C., a swine facility in Phillips County, Kansas, suffered a devastating fire on June 6, 2017. Terry Nelson, a Husky Hogs member, and his daughter-in-law Julia Nelson met with Tara Mahin at KDHE to discuss how they could rebuild and expand the Husky Hogs' operation.

Important to this expansion was K.S.A. 65-1,180, which establishes separation distances from water for swine facilities:

"(a) The department shall not approve a permit for construction of a new swine facility or expansion of an existing swine facility unless the swine waste management system for the facility:

. . . .

(3) . . . is located: (A) Not less than 500 feet from any surface water if the facility has an animal unit capacity of 3,725 or more; (B) not less than 250 feet from any surface water if the facility has an animal unit capacity of 1,000 to 3,724; or (C) not less than 100 feet from any surface water if the facility has an animal unit capacity of under 1,000."

Since Husky Hogs was located 250 feet from Prairie Dog Creek it was limited to 3,724 animal units (swine weighing more than 55 pounds are counted as 0.4 animal units while swine weighing 55 pounds or less count as 0.1 animal units). Prairie Dog Creek is a major tributary of the Upper Republican River and flows into the Harlan County Reservoir just over the Nebraska state line.

To accomplish the goal of expanding Husky Hogs without violating K.S.A. 65-1,180, Terry Nelson proposed to KDHE that he sell some of Husky Hogs' property to a separate entity, owed by Clarke and Julia Nelson, and permit each entity separately. Mahin responded by e-mail on June 20, 2017, and stated:

"As we discussed on the phone just a little while ago. The proposal below that was submitted on June 13th meets statutory and regulatory requirements. The real property (land and buildings) must be owned by a separate entity ('Clarke and Julia Nelson LLC') than Husky Hogs LLC. The two facilities must be operated as two separate operations. The proposed facility's waste management system, land application areas, waste conveyance mechanisms, and feed storage areas are required to be separate from Husky Hogs LLC. All current piping/conveyance mechanisms from those three buildings that currently connect to Husky Hogs' retention structures must be at a minimum permanently capped. It is recommended, if feasible, that the current piping from those three buildings to the Husky Hogs' retention structures be removed. Also, KDHE recommends that the two facilities maintain separate utilities (electric, water, etc.).

"The next step would be to submit a permit application; proof of separate ownership of the real property must be submitted with the permit application."

After this, a new limited liability company called Prairie Dog Pork, L.L.C. was formed. Husky Hogs and Nelson Farms executed a quitclaim deed granting Prairie Dog Pork a portion of Husky Hogs' property.

Both Husky Hogs and Prairie Dog Pork applied for individual permits from KDHE. Although the applications listed Husky Hogs and Prairie Dog Pork as the property owners, they listed Julia Nelson as the applicant. Husky Hogs proposed having 3,724.8 animal units while Prairie Dog Pork proposed having 2,429.2 animal units. Both Husky Hogs' and Prairie Dog Pork's applications stated they were 250 feet from Prairie Dog Creek. Husky Hogs would own the swine housed at Prairie Dog Pork and it would provide all feed, veterinary care, and labor.

Craig Volland wrote to KDHE on behalf of Sierra Club on September 12, 2017, to protest the tentative approval of the Husky Hogs and Prairie Dog Pork applications. Sierra Club is a national nonprofit environmental organization. In its letter, Sierra Club noted Husky Hogs operated the existing site which was permitted for 3,702.4 animal units of swine. By splitting the existing operation into two separate operations, the amount of animal units in the area would increase to 6,153.2. Sierra Club characterized the plan as a maneuver to circumvent the Legislature's requirement that facilities with 3,725 or more animal units be 500 feet away from public surface water. Sierra Club asserted that separate ownership of the facilities would do little to ameliorate the negative environmental consequences of "inserting 67% more animals into the same space."

The applications were each approved and opened for public comment. In December 2017, Sierra Club submitted a public comment which incorporated its September 2017 letter. It stated that it was objecting "on behalf of the Sierra Club" and

4

"members of the Sierra Club who live downstream of the subject site that would be affected by KDHE's actions, including Carl Wolfe who has a home near Republican City on Harlan County Lake in Nebraska and Wade Beisner who lives in Orleans and frequently recreates at the Lake." Sierra Club also submitted its comment "on behalf [of] citizens living in Phillips [County] and Norton County, [Kansas] who would be affected by new swine feeding operations resulting from the proposed expansion of the Husky Hogs swine breeding operation."

Sierra Club claimed the proposed sites were only 250 feet from Prairie Dog Creek and any runoff from waste application fields, manure piles, or seepage from wastewater could easily contaminate the water. This would then flow into the Upper Republican River and later the Harlan County Reservoir. Sierra Club cited testing conducted on Prairie Dog Creek 8.5 miles away from the proposed sites (as measured in a straight line, not the line formed by the creek) that showed the creek was "impaired with respect to both dissolved oxygen and total phosphorus for aquatic life." Sierra Club also cited groundwater monitoring performed along Prairie Dog Creek near Husky Hogs which showed increased nitrate levels. But Sierra Club admitted that "[t]he pronounced meander of the creek complicates determination of the direction of subsurface flow, and there are so many potential sources, including waste application fields and waste impoundments, that it is difficult to attribute elevated nitrate levels to any one of them." And Sierra Club noted that as recently as June 2016 a health alert was issued to recreational users of Harlan County Lake because of toxic blue-green algae, and "[b]lue-green algae is caused by excess nutrients such as the phosphorus and nitrogen contained in livestock wastewater." Sierra Club asserted that it was only reasonable to conclude that increasing animal numbers in the area, even if those animals are confined in separate operations, will increase pollution in the water.

Finally, Sierra Club argued KDHE misinterpreted K.A.R. 28-18a-4(d), titled "Filing of applications and payment of fees," in authorizing the proposed operations. At

5

the time, this regulation stated: "Swine facilities on separate pieces of land without a contiguous ownership boundary shall be classified as separate operations, and each applicant shall be assessed a fee under K.A.R. 28-16-56d." K.A.R. 28-18a-4(d). Sierra Club questioned whether the two proposed facilities were truly separate operations and said it was "obvious that Prairie Dog Pork, LLC was created expressly for the purpose of expanding production of piglets at the same site while evading the requirement set in place by the legislature for a greater distance from Prairie Dog Creek and from the neighbors for operations exceeding 3724 animal units." By interpreting K.A.R. 28-18a-4(d) to permit the two facilities, Sierra Club argued, KDHE would act inconsistently with the legislative intent underlying the statutes specifying setback distances from surface water and habitable structures.

KDHE responded to the public comments by noting:

"Kansas Administrative Regulations (K.A.R.) 28-18a-4(d) classifies swine facilities as separate operations if the facilities are located on separate pieces of land without a contiguous property ownership. The real property these three proposed facilities are to be located on do not share contiguous property ownership. The property the Husky Hogs, LLC facility is located on is owned by Husky Hogs, LLC; the property the Prairie Dog Pork, LLC facility is located on is owned by Prairie Dog Pork, LLC; and the property the Hilltop Nursery facility is located on is owned by AEC Swine, LLC. A quitclaim deed was submitted to KDHE that verifies there is not contiguous property ownership. Any questions regarding property appraisals need to be directed to the Phillips County Appraiser's Office.

"Under Kansas law, Limited Liability Companies do not have owners; they are composed of members and operated by managers. KDHE has not been directed by the Legislature to investigate members or managers of applicants, nor is there a legal requirement that an 'operating agreement' as defined in Kansas Statutes Annotated (K.S.A.) 17-7663(k) be submitted to KDHE."

Because Husky Hogs and Prairie Dog Pork are separate facilities, KDHE said they only had to be set back 250 feet from Prairie Dog Creek.

Next, KDHE addressed Sierra Club's concern that degradation of water quality would adversely impact the public, downstream property owners, and recreational users of Harlan County Lake. KDHE pointed out the existence of several requirements aimed at protecting water quality, all of which the proposed facilities satisfied.

As for Sierra Club's concern about blue-green algae in Harlan County Lake, KDHE said there were "many potential contributors of nitrogen and phosphorus located in a watershed." KDHE added that statutes and regulations were developed to minimize water pollution, and, once again, Permittees met them all. KDHE similarly responded to Sierra Club's concern with increased nitrate levels in the groundwater along Prairie Dog Creek.

In response to Sierra Club's concern about increasing animal numbers in the same area of land, KDHE said there was "no statutory or regulatory limit on the number of livestock that can be confined or located in a particular watershed." And the "KDHE does not have the authority to deny a water pollution control permit for a confined feeding facility when all applicable statutory and regulatory requirements are met."

KDHE issued permits to Husky Hogs and Prairie Dog Pork in December 2017.

*Rolling Hills Pork, L.L.C. and Stillwater Swine, L.L.C.*

Meanwhile, Clarke and Julia Nelson formed a second limited liability company, C & J Swine L.L.C., doing business as Rolling Hills Pork, L.L.C. Terry Nelson, acting through Nelson Farms, formed Stillwater Swine, L.L.C. In December 2017, Nelson

Farms deeded adjoining tracts in Norton County to Rolling Hills Pork and Stillwater Swine.

Rolling Hills Pork and Stillwater Swine each filed applications with KDHE in October 2017 for permits to operate swine facilities with capacities below 3,725 animal units. Husky Hogs would own the swine at each facility.

Volland submitted a public comment on behalf of Sierra Club on the Rolling Hills Pork and Stillwater Swine applications as well. The comment incorporated Sierra Club's September 2017 letter and December 2017 public comment on the Husky Hogs and Prairie Dog Pork permits. The comment stated that Sierra Club was

> "expanding [its] objection to the issuance of these permits on behalf of the Sierra Club members who live downstream of the subject site that would be affected by KDHE's actions, including Carl Wolfe who has a home near Republican City on Harlan County Lake in Nebraska and Wade Beisner who lives in Orleans and frequently recreates at the Lake, and other citizens living in Norton County, [Kansas] who may be affected by odor and reduced water quality."

As with its earlier objections, Sierra Club argued the two facilities should not be considered separate. Because Sierra Club asserted the two operations were actually one operation, it argued the permits should be denied for not meeting the statutory setbacks to the nearest habitable structure. Again, Sierra Club contended KDHE misinterpreted K.A.R. 28-18a-4(d) because the applicants admitted there was "'0 feet'" between their properties, and under the regulation swine facilities are separate only if they are "without a contiguous ownership boundary." If the two facilities were treated as one, then their permits would violate the setback requirements for water and habitable structures.

Sierra Club also alleged Stillwater Swine and Rolling Hills Pork submitted inaccurate and insufficient nutrient management plans that failed to address how

wastewater would be applied within the permitted areas. Sierra Club noted that one application pivot was "only about two hundred feet [from] the residence of Mr. Rodney Ross."

Rodney and Tonda Ross submitted a public comment in December 2017 expanding on their concerns about wastewater application. They were worried that on breezy days, the facilities would spray swine waste that could drift onto their property. Their comment did not state that they were Sierra Club members.

KDHE responded to the public comments it received on the Stillwater Swine and Rolling Hills Pork applications. In response to the assertion that the two facilities should be treated as one, KDHE said:

> "Kansas Administrative Regulations (K.A.R.) 28-18a-4(d) classifies swine facilities as separate operations if the facilities are located on separate pieces of land without a contiguous property ownership. The real property the two proposed facilities are to be located on do not share contiguous property ownership. The property Stillwater Swine is located on is owned by Nelson Farms, Inc. and the applicant is N. Terry Nelson and the property Rolling Hills Pork is located on is owned by C & J Swine, LLC and the applicants are Clarke and Julia Nelson."

KDHE also approved Stillwater Swine's and Rolling Hills Pork's nutrient management plans. But it added a condition to the permit requiring them to develop a plan to avoid swine waste spray drift near the Rosses' property.

KDHE issued a permit to Rolling Hills Pork in April 2018 and Stillwater Swine in June 2018.

*Administrative Appeals*

Sierra Club petitioned KDHE's Director of Environment to reconsider the four permits. When that failed, Sierra Club appealed to the KDHE Secretary, who also denied Sierra Club's appeals.

*Kansas Judicial Review Act Case in District Court*

Sierra Club next filed two petitions for review under the KJRA—one challenging the permits issued to Husky Hogs and Prairie Dog Pork; the other, Rolling Hills Pork and Stillwater Swine. Relevant to this appeal, Sierra Club's primary contentions were: (1) Sierra Club had standing to bring the KJRA actions and (2) the permits violated the setback requirements in K.S.A. 65-1,180(a)(3) because they should be treated as the same entity under K.A.R. 28-18a-4(d). Sierra Club asked the district court to revoke the permits.

Attached to Sierra Club's opening brief in support of its petition for judicial review were declarations from Carl Wolfe and Tonda and Rodney Ross. Sierra Club relied on these declarations in arguing that it had standing to bring the KJRA actions.

In his declaration, Wolfe stated he was a Sierra Club member and during KDHE's consideration of the permits at issue Sierra Club made comments and administrative appeals on his behalf in opposition to the permits. Wolfe also said he had a residence on the shore of Harlan County Reservoir and had lived there since 2002. Wolfe stated that he used the lake for birdwatching, fishing, boating, and water skiing. He was concerned because he thought the water quality at Harlan County Reservoir had diminished, which included blue-green algae outbreaks and warnings about e-coli contamination.

Wolfe, who identified himself as a wildlife biologist and educator, said that "[b]lue-green algae outbreaks are caused by, at least in part, increased nutrient runoff from [confined animal feeding operations] and leakage from waste impoundments in the alluvial aquifer." He explained that "[t]he nutrient runoff supplies essential components that increase blue-green algae growth." Similarly, he said that "[e]-coli contamination at Harlan County Reservoir is caused by, at least in part, animal wastes from [confined animal feeding operations] that are discharged into" various bodies of water that drain into the lake. Wolfe concluded that he was concerned the large concentration of confined animal feeding operations would increase the contaminants in the Republican River and Harlan County Reservoir.

The Rosses submitted a joint declaration. They also claimed to be Sierra Club members, although they did not say when they joined. The Rosses reiterated the concerns raised in their public comment on the Rolling Hills Pork and Stillwater Swine permit applications about spray from swine waste drifting onto their property. After KDHE issued the permits, the Rosses petitioned KDHE's Director of Environment for reconsideration and then the KDHE Secretary. Both petitions were denied.

The Rosses also said in their declaration that they owned a vacation home about a mile and a half from Harlan County Reservoir. They were concerned contamination from Rolling Hills Pork and Stillwater Swine would "cause further degradation of the lake's water quality." It was commonly understood, they said, that blue-green algae outbreaks "are related to, among other things, contamination from [confined animal feeding operations] that ends up in the lake." In their visits to the Harlan County Reservoir since 1991 for boating trips, the Rosses said the number of blue-green algae outbreaks had increased over time. They believed this increase coincided with the number of confined animal feeding operations in the areas that provide water to the lake.

11

Permittees intervened and the district court consolidated the cases for judicial review.

Permittees argued Sierra Club did not have standing because the evidence did not show that its members adequately participated in the agency proceedings or that its members suffered a cognizable injury. Permittees also asserted that Kansas law imposed no restrictions on locating two swine facilities next to one another if they were separately owned. KDHE asserted that the district court should only consider the facts within the agency record, not the declarations and other exhibits attached to Sierra Club's brief in support of its petition for review. Like Permittees, KDHE also argued Sierra Club lacked standing to bring the KJRA actions. Finally, KDHE asserted that it properly found K.A.R. 28-18a-4(d) to be the applicable regulation and interpreted it correctly.

The district court reversed KDHE's decision to grant the four permits in December 2019. The district court framed the issue as "whether KDHE properly interpreted and applied K.A.R. 28-18a-4(d) in issuing the four separate confined feeding facility permits for swine in Phillips and Norton Counties." As stated above, this regulation provides: "Swine facilities on separate pieces of land without a contiguous ownership boundary shall be classified as separate operations, and each applicant shall be assessed a fee under K.A.R. 28-16-56d." K.A.R. 28-18a-4(d).

In its factual findings, the district court found Husky Hogs and Prairie Dog Pork "share contiguous ownership boundaries." Similarly, because Rolling Hills Pork and Stillwater Swine are located next to each other, the district court found that they also "share contiguous ownership boundaries." Then, looking at K.A.R. 28-18a-4(d), the district court held the facilities that shared contiguous ownership boundaries should not be considered separate. The district court believed KDHE misinterpreted the statute by focusing on whether there was contiguous property *ownership*, not contiguous *ownership boundaries* as stated in the regulation.

12

Based on its finding that Husky Hogs and Prairie Dog Pork were not separate facilities, the district court held that permitting the facilities violated K.S.A. 65-1,180(a)(3), which prohibits swine facilities with animal unit capacities of 3,725 or more of being located less than 500 feet from any surface water. The district court applied the same analysis to Rolling Hills Pork and Stillwater Swine, finding their permits also violated K.S.A. 65-1,180(a)(3).

The district court also ruled that Sierra Club had standing to petition for review. Sierra Club had to show that it had both statutory and common-law standing. A person has statutory standing under the KJRA if the person "was a party to the agency proceedings that led to the agency action." K.S.A. 77-611(b). A person has common-law standing if the person can "show a cognizable injury and establish a causal connection between the injury and the challenged conduct." *Sierra Club v. Moser*, 298 Kan. 22, 33, 310 P.3d 360 (2013). Additionally, for an association to have standing, it must show, among other things, that its members have standing to sue individually.

The district court applied the associational standing test in determining whether Sierra Club had both statutory and common-law standing. As will be discussed later, this was error because the associational standing test is relevant only when looking at common-law standing, not statutory standing.

First, the district court held that Wolfe provided Sierra Club with statutory standing to challenge the Husky Hogs and Prairie Dog Pork permits. Even though Wolfe did not submit a public comment in the agency proceeding, the district court determined Sierra Club's comment was enough to find that Wolfe was a party to the agency proceedings. This was because Sierra Club submitted the public comment on behalf of its members who lived downstream of the subject sites, "including Carl Wolfe who has a home near Republican City on Harlan County Lake in Nebraska."

13

Next, the district court held that Wolfe provided Sierra Club with common-law standing. The court determined that Wolfe suffered a cognizable injury—diminished recreational enjoyment of the Harlan County Reservoir. The court also found Wolfe's declaration sufficient to establish causation, explaining:

"In Carl Wolfe's declaration, he states that he is a wildlife biologist and claims that there is a relationship between outbreaks of blue-green algae and contamination caused by confined animal feeding operations. Carl Wolfe alleges that the animal wastes from the confined animal feeding operations will be discharged into water bodies that drain into the Harlan County Reservoir. This is sufficient evidence to show a causal connection between the imminent injuries and the confined swine feeding operations."

The district court held that Sierra Club had standing to challenge the Rolling Hills Pork and Stillwater Swine permits based on the Rosses' individual standing. The court identified the contested issue as whether the Rosses satisfied the common-law standing requirements—cognizable injury and causation. Like with Wolfe, the district court held the Rosses were injured by diminished recreational enjoyment of the Harlan County Reservoir caused by confined animal feeding operations. The Rosses also submitted evidence of additional injury caused by the threat of swine waste drifting onto their property.

With these findings, the district court reversed KDHE's action related to the issuance of the four permits. The court "remand[ed] this matter to KDHE for further proceedings on these applications for permits consistent with this ruling."

The district court denied a motion for stay and request to alter or amend. Permittees appealed.

There have been several developments since Permittees appealed. In May 2020, KDHE issued notices of its intent to revoke the four permits. Permittees requested an

14

administrative hearing on the notices. In January 2021, the Office of Administrative Hearings (OAH) stayed the proceedings pending the outcome of this appeal.

Sierra Club moved this court for involuntary dismissal of this appeal in November 2020. Sierra Club argued that this court lacked jurisdiction over the appeal because Permittees had not fully exhausted their administrative appeals. Essentially, Sierra Club argued that because KDHE had only issued notices to revoke and had not yet conducted an evidentiary hearing to determine whether the permits should be officially revoked, Permittees had not exhausted their administrative remedies. We denied the motion in December 2020.

At some point, Permittees submitted four new applications to modify their permits. A notice of the applications was published in the Kansas Register in April 2021. Each notice stated that the only modification to the permit was a change of property boundary. Sierra Club filed public comments objecting to issuance of the permits. KDHE issued the four modified permits to Permittees in June 2021. Sierra Club petitioned for reconsideration in August 2021, but its petitions were denied in November 2021. Sierra Club appealed the denials of its petitions for reconsideration to the KDHE Secretary. According to a brief filed by Sierra Club in January 2022, Permittees' administrative appeals from the notices of intent to revoke were still stayed.

In July 2021, KDHE amended K.A.R. 28-18a-4(d), the regulation the district court relied on in finding the two adjacent facilities should be treated as one. The amended regulation no longer contains the disputed language about "contiguous ownership boundaries." It now states adjoining swine facilities should be classified only as one swine facility if they have a common waste management system. K.A.R. 2021 Supp. 28-18a-4(d). Permittees each have a separate waste management system.

KDHE filed a notice with this court in August 2021. KDHE argued the issuance of the modified permits and the amendment to K.A.R. 28-18a-4 rendered the issues appealed either moot or not ripe for review. Sierra Club disagreed, asserting that the appeal was not moot because the material facts remain unchanged. Sierra Club argued that "[i]nserting buffers between facilities does not change the fact that the same quantity of swine is still located in the same particular space and the same proximity to surface water." Sierra Club asked this court for a chance to brief the issues raised in KDHE's notice and Sierra Club's response, which we allowed.

Before summarizing the parties' supplemental briefing, it is important to understand what arguments the parties raised in their briefs. Both Permittees and KDHE argued that Sierra Club lacked standing. Sierra Club, of course, disagreed.

Permittees also raised several alternative statutory interpretation arguments. First, Permittees argued that both the district court and KDHE erred in applying K.A.R. 28-18a-4(d) because "[t]his regulation is about fees; it does not implement K.S.A. 65-1,180 and should not govern." Second, Permittees argued that KDHE reached the right result even though it applied the wrong regulation. Permittees suggested that KDHE should have applied K.A.R. 28-18a-11, which adopts by reference a federal regulation that defines "concentrated animal feeding operation" in a manner favorable to Permittees. Finally, Permittees argued that even if K.A.R. 28-18a-4(d) did apply, the district court misinterpreted it.

Sierra Club argued the district court correctly interpreted K.S.A. 65-1,180(a)(3) and K.A.R. 28-18a-4(d). Sierra Club acknowledged that the district court based its ruling on its interpretation of K.A.R. 28-18a-4(d). Sierra Club also suggested that the district court held that K.S.A. 65-1,180(a)(3) provided a separate and independent basis for invalidating the permits. According to Sierra Club, the district court found that K.S.A. 65-1,180(a)(3) is not solely focused on the separateness of waste management systems.

16

The setback requirements imposed by the statute also turn on "the concentration of animals located on a particular space or area and the proximity of that area to surface water" without reference to who owns the animals. Permittees replied and argued that Sierra Club mischaracterized K.S.A. 65-1,180 and the district court's decision. Permittees asserted that the district court "acknowledged that Kansas law does not impose separation distances between swine facilities."

KDHE argued this court did not have jurisdiction over the appeal because remand orders are not appealable in the administrative context. KDHE also asserted that Sierra Club failed to exhaust its administrative remedies given the ongoing OAH proceedings following the district court's remand. Finally, KDHE argued the case was not ripe for adjudication because Permittees submitted applications to modify their permits and because an amendment to K.A.R. 28-18a-4(d) was pending before KDHE.

Before the court are the parties' supplemental briefs. Sierra Club, apparently no longer seeking involuntary dismissal of this appeal, argues against dismissal. Permittees also argue against dismissal, though on different grounds. KDHE is the sole party favoring dismissal on mootness grounds.

In its supplemental brief, KDHE asserts that this court lacks jurisdiction to consider the appeal and the issues are moot. Permittees are currently authorized to operate under the modified permits and the old permits are no longer effective. As for jurisdiction, KDHE notes that standing is a component of jurisdiction. As stated above, Sierra Club must show that one or more of its members suffered an injury caused by the challenged conduct. Because the modified permits and not the permits Sierra Club challenges in this appeal caused Sierra Club's alleged injury, KDHE claims Sierra Club lacks standing to appeal from a decision on the original permits. Alternatively, KDHE asserts that the issues are moot since it issued the modified permits under a new set of facts. And K.A.R. 28-18a-4(d), "which was the linchpin of the district court's orders to

17

remand for reconsideration of the issuance of the former permits, was materially altered by a 2021 amendment."

Sierra Club argues the case is not moot because the permit modifications do not change the material facts in the case. The amended regulation was not in effect when the modified permits issued. Even if the case is moot, Sierra Club argues that an exception to the mootness doctrine applies—the interpretation of the setback requirements in K.S.A. 65-1,180 is capable of repetition and raises concerns of public importance. Sierra Club contends the ultimate issue in this appeal is whether permitting the two pairs of swine facilities violates K.S.A. 65-1,180. Sierra Club states that "Permittees' and KDHE's attempt to moot this case by inserting and approving buffers between two adjacent facilities is flawed and proves that similar schemes will be used time-and-time again by the swine [confined animal feeding operation] industry to evade the purpose and statutory setbacks established by K.S.A. 65-1,180."

Permittees argue that the "appeal is not moot because Sierra Club continues to attack the legality of [Permittees'] existing swine facilities before the Secretary of Health and Environment, despite the [KDHE's] granting of [Permittees'] modified permit applications." Permittees also argue the appeal is not moot because the Secretary has not ruled on Sierra Club's request for reconsideration of KDHE's "decision to issue the modified permits and because the original and modified permits have issues in common." Permittees assert that "dismissal of this appeal without vacating the District Court's decision would have law-of-the-case or *res judicata* implications during judicial review of the modified permits."

Permittees also assert that exceptions to the mootness doctrine apply. First, Permittees argue the appeal should not be dismissed because it raises issues capable of repetition and present concerns of public importance. In this appeal and in its appeal of the modified permits, Sierra Club argues that K.S.A. 65-1,180(a)(3) requires adjacent

swine facilities to combine their animal units for calculating setback distances. Second, Permittees argue that consideration of this appeal is necessary to preserve their rights for future litigation.

Permittees ask this court to either address the merits of this appeal, or at least refrain from deciding whether the appeal is moot until the Secretary issues a decision on Sierra Club's request for reconsideration of the modified permits.

In February 2022, the parties informed the court that the KDHE Secretary denied Sierra Club's request for reconsideration. Sierra Club has filed another KJRA petition in district court challenging the issuance of the modified permits.

*Jurisdiction over this appeal*

Before considering whether this appeal is moot, we must first determine whether we have jurisdiction over the appeal. KDHE claims we lack jurisdiction over this case because the district court did not issue a final order.

"'Kansas appellate courts may exercise jurisdiction only under circumstances allowed by statute.' [Citation omitted.]" *Kaelter v. Sokol*, 301 Kan. 247, 249, 340 P.3d 1210 (2015). "Decisions on petitions for judicial review of agency action are reviewable by the appellate courts as in other civil cases." K.S.A. 77-623. In civil cases, "the appellate jurisdiction of the court of appeals may be invoked by appeal as a matter of right from . . . [a] final decision in any action." K.S.A. 2020 Supp. 60-2102(a)(4). A final decision is "an order that definitely terminates a right or liability involved in an action or that grants or refuses a remedy as a terminal act in the case." *Kaelter*, 301 Kan. at 250. It "generally disposes of the entire merits of a case and leaves no further questions or possibilities for future directions or actions by the lower court." 301 Kan. at 249-50.

19

Here, the district court reversed KDHE's action granting the permits based on its holding that the permits violated the minimum separation distances from surface water requirements in K.S.A. 65-1,180. In conclusion, the court stated:

"For the reasons stated above, the Court reverses the final agency action of the Kansas Department of Health and Environment which granted the four subject permits for confined feeding facilities for swine and remands this matter to KDHE for further proceedings on these applications for permits consistent with this ruling. The Court need not and will not address the other issues raised by the Petitioner concerning the alleged degradation of water quality in Prairie Dog Creek, the failure to properly measure the depth to ground water, the failure to adequately ensure proper wastewater application and the alleged lack of reasonable measures to avoid spray drift, because those issues arise out of the issuance of the permits and will once again have to be considered and addressed by the agency on remand."

Citing several cases, KDHE asserts that "the general rule is that remand orders are not appealable" because they are not final orders. But KDHE fails to mention that these cases are dealing with situations in which the district court remands a decision to an agency for more findings of fact. In *Holton Transport, Inc. v. Kansas Corporation Comm'n*, 10 Kan. App. 2d 12, 12, 690 P.2d 399 (1984), cited by KDHE, the court found that "[t]he threshold question is whether the court's order of remand for further findings of fact is an appealable order." And in another case cited by KDHE, *Williams v. General Electric Company*, 27 Kan. App. 2d 792, Syl. ¶ 2, 9 P.3d 1267 (1999), this court found that "[a]n order of remand from the Workers Compensation Board to an administrative law judge for additional findings of fact is not a final order subject to appellate review absent exceptional circumstances." While *Williams* involved a remand order from an administrative body and not a district court, it discussed whether a remand order is a final order.

20

Kansas appellate courts have reviewed district court remand orders in cases that do not involve remand for more findings of fact. For example, in *Kansas Dept. of Transportation v. Humphreys*, 266 Kan. 179, 967 P.2d 759 (1998), the Kansas Department of Transportation (KDOT) terminated the employment of Roberta Humphreys. Humphreys appealed to the Kansas Civil Service Board, which entered an order modifying the agency's dismissal to suspension without pay for a specified time and demotion. KDOT appealed to the district court. The district court ruled the Board should have limited its review to whether the dismissal was reasonable. The district court remanded the matter to the Board to affirm or reverse Humphreys' termination. Humphreys appealed, arguing the Board had the legal authority to modify KDOT's disciplinary decision. The Kansas Supreme Court held that it had jurisdiction to consider the district court's remand order. The court reasoned: "Here, Humphreys exhausted her administrative remedies. KDOT appealed from the Board's final order. The district court remanded the case to the Board. The district court's decision was final. Humphreys appealed the district court's order to the Court of Appeals. This she is permitted to do by K.S.A. 77-623." 266 Kan. at 181.

This case is more like *Humphreys* than cases in which the district court remanded for additional factual findings. Permittees applied and were granted permits for adjacent facilities. When considered separately, each facility's animal unit numbers did not exceed K.S.A. 65-1,180(a)(3)'s setback requirements. But if the animal units of each pair of facilities were combined, the facilities would violate these setback requirements. The district court reversed KDHE's decision because it found that KDHE should have combined the animal units for each pair of facilities. It remanded the "matter to KDHE for further proceedings on these applications for permits consistent with this ruling." Although the case was remanded, there was no call for additional factual determinations. Nor would there be a need for any—the district court ruled that the proposed facilities violated K.S.A. 65-1,180(a)(3). More fact-finding could not alter that decision. The order

21

was thus a final decision under K.S.A. 2020 Supp. 60-2102(a)(4), and this court has jurisdiction over the district court's decision.

As KDHE notes, the district court did leave some matters undecided. Sierra Club raised several alternative issues in its petitions for judicial review, including whether KDHE violated its anti-degradation policy for Prairie Dog Creek in issuing the Husky Hogs and Prairie Dog Pork permits, whether KDHE properly complied with regulatory requirements covering depth to ground water for the Husky Hogs and Prairie Dog Pork permits, and whether the permits for Rolling Hills Pork and Stillwater Swine include appropriate plans for wastewater application and spray drift. The district court found that it "need not and will not address" these issues and that they would "once again have to be considered and addressed by the agency on remand."

KDHE argues the district court's statement about these undecided factual issues shows its decision was not a final order. This argument is not persuasive. The district court's statement is somewhat misleading. Given its holding on the setback requirements of K.S.A. 65-1,180, there was no action KDHE could have taken on the applications other than denying them. As a result, we find we have jurisdiction to consider the district court's decisions on standing and K.S.A. 65-1,180.

*Mootness*

The next question we must address is whether any issues on appeal are rendered moot by changed factual and legal circumstances. The two major issues on appeal are: (1) whether Sierra Club has standing to petition for judicial review of KDHE's action and (2) whether the district court properly interpreted the relevant laws.

Because mootness is a court policy doctrine, which courts developed through precedent, appellate review of the issue is unlimited. As a general rule, Kansas appellate

22

courts do not decide moot questions or render advisory opinions. Under the mootness doctrine, the court is to determine real controversies about the legal rights of persons and properties that are involved in the case properly before it and to adjudicate those rights in a way that is operative, final, and conclusive. *State v. Roat*, 311 Kan. 581, 590, 466 P.3d 439 (2020). An issue on appeal will be dismissed only as moot if a party can show clearly and convincingly that the actual controversy has ended, the only judgment we could enter would be ineffectual for any purpose, and the judgment would not impact any of the parties' rights. 311 Kan. at 592. "The party asserting mootness generally bears the initial burden of establishing that a case is moot in the first instance. [Citation omitted.]" 311 Kan. at 593.

Appellate courts commonly apply an exception when an issue "'is capable of repetition and raises concerns of public importance.'" *State v. Kinder*, 307 Kan. 237, 244, 408 P.3d 114 (2018). "Public importance means more than that certain members of the general public are interested in the decision of the appeal from motives of curiosity or because it may bear upon their individual rights or serve as a guide for their future conduct. [Citation omitted.]" *State v. Hayden*, 52 Kan. App. 2d 202, 206, 364 P.3d 962 (2015).

The issue here is whether Permittees can operate their pairs of facilities with adjacent property lines. KDHE believed they could, so it permitted the facilities. The district court disagreed and reversed the agency action granting the permits. At the outset, we note the changed property boundaries and resulting applications for modified permits are not relevant to resolution of this appeal. The question on appeal is not whether Permittees can operate their facilities with a strip of land inserted between them. What Permittees wanted, and what they ask this court to grant them an opportunity to argue for on appeal, is reinstatement of the four initial permits issued by KDHE. The modified permits are not before us.

Along these same lines, we can dispose of KDHE's argument that the modified permits caused Sierra Club to lose standing (assuming it had standing to begin with). While it is true that Sierra Club's alleged injuries are currently caused by the modified permits, there remains a threatened injury in that this court could reverse or vacate the district court's decisions on the original permits. Similarly, KDHE's argument in its original brief that the case is not ripe for adjudication because of Permittees' applications for modified permits is also unpersuasive. Permittees applied for the modified permits to protect the continuity of their operations, not because they wanted to forfeit their request to operate the pairs of facilities adjacently. Failure to address the issues in this appeal because Permittees obtained modified permits would deprive Permittees of the opportunity to obtain the permits that they originally sought. Deciding on this basis would also hurt future parties. Parties would have to choose between: (1) ceasing or delaying operations to pursue an appeal of a denied permit or (2) making do with the circumstances and apply for a modified permit as Permittees did here at the cost of losing their opportunity to pursue the permit on its original grounds.

A mootness determination must include an analysis of whether a judgment from this court "on the merits would have meaningful consequences for any purpose, including future implications." *Roat*, 311 Kan. at 592-93. Here, failure to address the appeal's merits would deprive Permittees of their opportunity to seek reinstatement of their original permits. While it is true that Permittees managed to avoid the consequences of the district court's unfavorable interpretation of K.A.R. 28-18a-4(d) by inserting a buffer between their facilities, that solution should not cost Permittees the right to appeal their permits for adjacent facilities. And while Permittees could avoid the district court's interpretation of K.A.R. 28-18a-4(d) by reapplying for a permit now that the new regulation is in effect, they should not have to apply for a new or modified permit if they are already entitled to the permits as originally issued.

24

KDHE has failed to clearly and convincingly show "'the actual controversy has ended, the only judgment that could be entered would be ineffectual for any purpose, and it would not impact any of the parties' rights.'" 311 Kan. at 592. For these reasons, we find the issues on this appeal are not moot.

*Standing*

"[P]arties in a judicial action must have standing as part of the Kansas case-or-controversy requirement imposed by the judicial power clause of Article 3, § 1 of the Kansas Constitution." *Moser*, 298 Kan. at 29. Standing is a component of subject matter jurisdiction. This court exercises unlimited review over whether a party has standing. 298 Kan. at 29.

To establish standing, Sierra Club had to show that it had statutory standing under the KJRA and that it satisfied the traditional associational standing test set out in Kansas caselaw. *Friends of Bethany Place v. City of Topeka*, 297 Kan. 1112, 1121-22, 307 P.3d 1255 (2013). This test provides: "An association has standing to sue on behalf of its members if: (1) the members have standing to sue individually; (2) the interests the association seeks to protect are germane to the organization's purpose; and (3) neither the claim asserted nor the relief requested requires participation of individual members." 297 Kan. at 1126.

*Statutory Standing*

The first question is whether Sierra Club had statutory standing under the KJRA to petition for review of KDHE's action. The KJRA provides that these persons have standing to petition for judicial review of an agency action:

"(a) A person to whom the agency action is specifically directed;

"(b) a person who was a party to the agency proceedings that led to the agency action;

"(c) if the challenged agency action is a rule and regulation, a person subject to that rule; or

"(d) a person eligible for standing under another provision of law." K.S.A. 77-611.

The parties focus their arguments on subsection (b).

The parties and district court misunderstood the distinction between statutory standing and traditional standing. Sierra Club argued below that it had statutory standing because its members, Wolfe and the Rosses, participated in the agency proceedings below and thus had statutory standing to sue individually. The district court agreed. It held that because Sierra Club mentioned Wolfe's name in its public comment, Wolfe participated in, and thus was a party to, the proceedings. It held that the Rosses' submission of a public comment was also sufficient participation to make the Rosses parties to the proceedings. On appeal, Permittees only challenge Sierra Club's statutory standing as to the Husky Hogs and Prairie Dog Pork permits. The parties all focus their arguments on whether Wolfe participated sufficiently in the proceedings to be considered a party. The problem with the parties' and district court's approach, however, is that statutory standing is distinct from traditional standing. There is no requirement that Sierra Club establish that its members participated in the proceedings for it to establish statutory standing.

This is evident in Kansas associational standing cases. In *Sierra Club v. Moser*, Sierra Club challenged KDHE's decision to issue an air emission source construction permit. When examining whether Sierra Club had statutory standing under the KJRA, the court held that Sierra Club's participation in the proceedings and submission of comments

26

was enough to accord party status in the proceedings. The court did note that Sierra Club and its members submitted comments, but it did not state that the members' participation in the proceeding was necessary. Rather, the focus was on Sierra Club's participation. 298 Kan. at 30-32. Later, while analyzing whether Sierra Club had traditional standing, the court turned its focus to whether Sierra Club's individual members would have standing to sue. 298 Kan. at 33-42.

This was also the case in *Board of Sumner County Comm'rs v. Bremby*, 286 Kan. 745, 189 P.3d 494 (2008). There, the court found that the Board of Commissioners had statutory standing under the KJRA to challenge KDHE's issuance of a landfill construction permit because the Board submitted comments and a study it commissioned to KDHE during the permit proceedings. 286 Kan. at 759. The court did not state that individual members of the Board needed to participate in the proceedings. Not until the court discussed traditional standing did it consider whether the "individuals represented by the Board would have standing to challenge the agency's decision under the traditional injury test." 286 Kan. at 761, 763-64.

Sierra Club was "a person who was a party to the agency proceedings that led to the agency action." K.S.A. 77-611(b). The KJRA includes associations in its definition of "person." K.S.A. 77-602(h). An "interested persons' submission of written comments during a public notice and comment period . . . qualif[ies] as participation within the meaning of the KJRA's standing requirements." *Bremby*, 286 Kan. at 758. There is no question that Sierra Club publicly commented on the proceedings during the public notice and comment period for each of the permits at issue. As a result, we find that Sierra Club has statutory standing under the KJRA to pursue this action.

*Traditional Standing*

Having found that Sierra Club had statutory standing to petition for judicial review of the permits, the next question is whether Sierra Club had traditional, also called common-law, standing. When an association sues on behalf of its members, it has standing when:  "(1) the members have standing to sue individually; (2) the interests the association seeks to protect are germane to the organization's purpose; and (3) neither the claim asserted nor the relief requested requires participation of individual members." *Friends of Bethany Place*, 297 Kan. at 1126. Sierra Club's members have standing to sue individually if they can "show a cognizable injury and establish a causal connection between the injury and the challenged conduct." *Moser*, 298 Kan. at 33.

Before proceeding, we must address a threshold issue of what evidence can be considered in analyzing this issue. Sierra Club attached affidavits to its opening brief in support of its petition for judicial review that it relied on in establishing standing. The district court ruled that although this evidence was outside the agency record, it could be considered on the standing issue. This tracks Kansas Supreme Court precedent, which provides "that a petitioner may rely on the administrative record or may file affidavits or declarations with a court to establish standing of a party seeking judicial review of an agency action" and "[a] court, when determining if it has jurisdiction to review an agency action, can consider the affidavits and declarations as evidence of a petitioner's standing." 298 Kan. at 39. Additionally, we may consider these affidavits whether or not Wolfe and the Rosses participated in the agency proceedings because "the statutory standing requirement of participation in the process" does not "carr[y] over into the traditional association standing test." 298 Kan. at 40.

The district court held that Wolfe and the Rosses each satisfied the traditional standing requirements and provided Sierra Club with associational standing. We examine the court's holdings as to Wolfe first, then the Rosses.

28

*Carl Wolfe*

*Injury*

The district court held that Wolfe demonstrated injury by asserting that issuing the contested permits would impair his recreational use of Harlan County Reservoir.

The United States Supreme Court has "held that environmental plaintiffs adequately allege injury in fact when they aver that they use the affected area and are persons 'for whom the aesthetic and recreational values of the area will be lessened' by the challenged activity." *Friends of the Earth, Inc. v. Laidlaw Environmental Services (TOC), Inc.*, 528 U.S. 167, 183, 120 S. Ct. 693, 145 L. Ed. 2d 610 (2000).

Wolfe said he was concerned that large concentrations of swine in confined animal feeding operations, such as the ones at issue, would increase contaminants in the Reservoir. This would limit the activities he can enjoy at the lake. He stated that he was concerned about all four permits at issue. Wolfe alleged that he used the affected area and that the challenged activity would lessen the recreational value of the area. This is sufficient under Supreme Court precedent for Wolfe to establish sufficient injury for Sierra Club to petition for review of the four permits.

KDHE argues that Wolfe's alleged injury is too general. A cognizable injury must be particularized, meaning it "affect[s] the plaintiff in a '"personal and individual way."'" *Gannon v. State*, 298 Kan. 1107, 1123, 319 P.3d 1196 (2014). The alleged injury "cannot be a '"generalized grievance"' and must be more than '"merely a general interest common to all members of the public."'" 298 Kan. at 1123. This concept was discussed in *Sierra Club v. Morton*, 405 U.S. 727, 92 S. Ct. 1361, 31 L. Ed. 2d 636 (1972). There, Sierra Club filed an action for declaratory judgment preventing the construction of a ski resort in the Mineral King Valley in California. The district court granted the preliminary

29

injunction but was ultimately reversed by the Ninth Circuit. The Ninth Circuit held that Sierra Club lacked standing because "there was 'no allegation in the complaint that members of the Sierra Club would be affected by the actions of (the respondents) other than the fact that the actions are personally displeasing or distasteful to them.'" 405 U.S. at 731. The United States Supreme Court agreed with the Ninth Circuit.

The Court began by identifying the evidence relevant to Sierra Club's alleged injury. 405 U.S. at 734. It noted that Sierra Club alleged that the development "'would destroy or otherwise adversely affect the scenery, natural and historic objects and wildlife of the park and would impair the enjoyment of the park for future generations.'" 405 U.S. at 734. The Court recognized that this type of harm might amount to injury, but stated that "the 'injury in fact' test requires more than an injury to a cognizable interest. It requires that the party seeking review be himself among the injured." 405 U.S. at 734-35. The Court then stated:

> "The impact of the proposed changes in the environment of Mineral King will not fall indiscriminately upon every citizen. The alleged injury will be felt directly only by those who use Mineral King and Sequoia National Park, and for whom the aesthetic and recreational values of the area will be lessened by the highway and ski resort. The Sierra Club failed to allege that it or its members would be affected in any of their activities or pastimes by the Disney development. Nowhere in the pleadings or affidavits did the Club state that its members use Mineral King for any purpose, much less that they use it in any way that would be significantly affected by the proposed actions of the respondents." 405 U.S. at 735.

Sierra Club did provide adequate allegations of Wolfe's injury. Wolfe specified that he uses Harlan County Reservoir for recreation, and that Permittees' proposed actions would decrease the recreational value of the lake to him. This is the particularity that the Supreme Court called for in *Sierra Club v. Morton*. KDHE's argument is not persuasive on this point.

30

*Causation*

In ruling on causation, the district court noted that Wolfe said he was a wildlife biologist and that he claimed there was a relationship between blue-green algae outbreaks and contamination caused by confined animal feeding operations. Wolfe also stated that animal wastes from the proposed confined animal feeding operations would be discharged into water bodies that drain into the Harlan County Reservoir. The district court found this evidence sufficient to establish a causal connection between the alleged injuries and the proposed permits.

Similar causation evidence was presented and found insufficient in *Sierra Club v. Moser*, 298 Kan. 22. There, Sierra Club sought judicial review of KDHE's decision to issue an air emission source construction permit to a power plant called Holcomb 2. Sierra Club asserted that the permit would injure its members' health by harming the environment. As evidence that it had common-law standing to bring the action, Sierra Club provided a declaration from one of its members—Barbara Campbell. Campbell's declaration stated that "'[a]s an elderly person, [she was] very worried about breathing the pollutants that will come from the new coal plant, and the negative effects that those pollutants may have on [her] health.'" 298 Kan. at 40. The Kansas Supreme Court held:

> "While the declaration thus provides evidence of Campbell's proximity to the Holcomb 2 site and her age, her expression of 'concern' does not establish a causal relationship between these characteristics and an imminent and probable injury related to adverse effects of anticipated pollutants from Holcomb 2. But we are aware of no authority that requires a declarant to both state a threatened injury and establish a causation theory without the assistance of an expert. In fact, where, as here, causation is based on scientific evidence and is not within common understanding, we generally require the opinion of an expert. See, e.g., *Schlaikjer v. Kaplan*, 296 Kan. 456, 464, 293 P.3d 155 (2013). Given that, it is appropriate to examine whether there is other evidence that establishes the missing causal link." 298 Kan. at 40-41.

The court then looked at other evidence in the record to conclude that Sierra Club established causation. First, the court noted that KDHE conducted an air quality impact analysis which suggested "that proximity to the plant, including the 4-mile distance of Campbell's home, increases the exposure to potentially harmful pollutants." 298 Kan. at 41. Second, the court looked at a written declaration provided by Sierra Club from Dr. Jonathan Levy, an Associate Professor of Environmental Health and Risk Assessment at the Harvard School of Public Health. Dr. Levy contended that the Holcomb 2 construction "'would contribute to particulate matter concentrations in the vicinity of the plant and in downwind areas, increasing the health risks . . . to individuals in those areas.'" 298 Kan. at 41. The exposure was also linked to several serious health problems more likely to occur in sensitive populations, including elderly persons like Campbell. 298 Kan. at 41.

Wolfe's affidavit is much like Campbell's declaration. Wolfe was concerned about contaminants that may come from the proposed facilities and the negative effects those contaminants may have on Harlan County Reservoir. As in *Sierra Club v. Moser*, Wolfe's affidavit does not establish a causal relationship between the proposed facilities and alleged injury. Causation here is based on scientific evidence that is not within common understanding, so like in *Sierra Club v. Moser* an expert opinion was necessary to establish causation.

While the district court noted that Wolfe was a wildlife biologist, it did not find that he was qualified to offer an expert opinion on water-related issues. For a witness to provide expert testimony, the testimony must be "based on sufficient facts or data" and "the product of reliable principles and methods." K.S.A. 2020 Supp. 60-456(b). The witness must also show that he or she "has reliably applied the principles and methods to the facts of the case." K.S.A. 2020 Supp. 60-456(b).

Sierra Club has not provided sufficient evidence that Wolfe's alleged injuries are fairly traceable to the permits at issue. According to Sierra Club, Harlan County Reservoir is about 14 miles from Permittees' proposed sites. Prairie Dog Creek is a tributary of the Upper Republican River which flows into the Harlan County Reservoir. Sierra Club admitted that Prairie Dog Creek has a "pronounced meander." While the specific creek length is not evident from the record, the distance between the proposed facilities and Harlan County Reservoir, when traveling by creek, would be many miles.

Courts in other jurisdictions have refused to presume that "an injury is fairly traceable to a defendant's conduct solely on the basis of the observation that water runs downstream." *Friends of the Earth, Inc. v. Crown Central Petroleum Corp.*, 95 F.3d 358, 362 (5th Cir. 1996). Plaintiffs must provide other evidence. The 5th Circuit stated that people who use waterways "far downstream from the source of unlawful pollution may satisfy the 'fairly traceable' element by relying on alternative types of evidence." 95 F.3d at 362. The court suggested that plaintiffs in such cases could "produce water samples showing the presence of a pollutant of the type discharged by the defendant upstream or rely on expert testimony suggesting that pollution upstream contributes to a perceivable effect in the water that the plaintiffs use." 95 F.3d at 362; see also *Friends of the Earth, Inc. v. Gaston Copper Recycling Corp.*, 204 F.3d 149, 162 (4th Cir. 2000) ("In applying the 'fairly traceable' requirement, some distinction, of course, must be made between plaintiffs who lie within the discharge zone of a polluter and those who are so far downstream that their injuries cannot fairly be traced to that defendant.").

Sierra Club mentioned in its public comment that Prairie Dog Creek had been tested about 8.5 miles away from the proposed sites, and the test results showed excess levels of certain nutrients in the water. But Sierra Club admitted that those nutrients could have come from many sources. There was no evidence tying Permittees to the threatened harm alleged. For these reasons, Wolfe did not provide Sierra Club with standing to petition for judicial review of KDHE's action. The district court erred in holding

otherwise. Because Wolfe was the sole basis for Sierra Club's challenge to the Husky Hogs and Prairie Dog Pork permits, the district court's decision on those permits should be reversed for lack of jurisdiction.

*Rodney and Tonda Ross*

The district court also ruled that Sierra Club had associational standing based on the Rosses' individual standing. But the Rosses only claimed that the Rolling Hills Pork and Stillwater Swine permits threatened them with injury so even if they provide Sierra Club with standing, the standing will only allow Sierra Club to challenge those two permits. The district court found that the Rosses provided sufficient allegations of two injuries that would result from issuing the permits. First, it held that the Rosses alleged the same injury as Wolfe for impaired recreational use of Harlan County Reservoir. Second, it held that the Rosses alleged further injury on their claim that swine waste from the facilities might drift onto their property.

Permittees argue we must disregard Sierra Club's claims based on the Rosses' individual standing because no evidence showed that the Rosses were Sierra Club members until they filed their January 19, 2019 declaration. Sierra Club's petition for review for the two permits was filed in September 2018. While Sierra Club's petition for judicial review does state that Rodney was a member (it did not mention Tonda), there is no evidence in the agency record or in the declarations presented to the district court to support this assertion. None of the public comments submitted during the agency proceedings mention that the Rosses were Sierra Club members. The Rosses' declaration states that they are members but does not state when they joined Sierra Club. Sierra Club's failure to provide evidence that the Rosses were members when it petitioned for review is fatal to Sierra Club's claim that it has standing because the Rosses have individual standing.

Sierra Club attached a declaration to its appellate brief from its business records custodian alleging the Rosses became Sierra Club members on August 2, 2018. But considering the declaration would be inappropriate because "[m]aterial which is annexed to an appellate brief by way of an appendix is not a substitute for the record itself and cannot be considered on appeal." *In re Gershater*, 270 Kan. 620, 633, 17 P.3d 929 (2001); Supreme Court Rule 6.03(b) (2022 Kan. S. Ct. R. at 36).

Acknowledging this general rule, Sierra Club argues that, because a district court can look at evidence outside the agency record to determine standing, the appellate court can also look at evidence outside the district court record. See *Moser*, 298 Kan. at 39. Sierra Club cites no caselaw to support its proposition. Further, the rationale for allowing the district court to consider evidence outside the agency record does not apply in the appellate context. A district court may consider evidence on standing not submitted to an agency because petitioners need not establish standing to participate in proceedings before an agency. The constitutional requirement to establish standing does not arise until the petitioner seeks judicial review. 298 Kan. at 36-37. Because an agency is not asked to rule on standing, the district court is not reviewing an agency action when it makes a standing determination. "And, although an organization such as Sierra Club *could* establish the prerequisites for associational standing at the administrative level, it is not required to do so." 298 Kan. at 39. On appeal, however, the petitioner needed to provide evidence of standing to the district court. This court is limited to reviewing only the evidence that is in the record. Sierra Club's assertion to the contrary is not persuasive.

Even if Sierra Club had provided sufficient evidence that the Rosses were members when it petitioned for review, the district court still erred in finding that the Rosses had individual standing.

The district court first held that the Rosses shared the same harm as Wolfe on diminished recreational enjoyment of Harlan County Reservoir. Yet the Rosses'

35

declaration was less specific on this subject than Wolfe's. The Rosses stated that they owned a vacation home near Harlan County Reservoir and they were worried about degradation of the lake's water quality caused by the Rolling Hills Pork and Stillwater Swine permits. They did not state that their own recreational interests on the lake would be impaired. While they mentioned that they enjoy boating on the lake, they did not state that their boating activities would be limited by issuance of the permits. "The relevant showing for Article III standing is not injury to the environment but injury to the plaintiff." *Friends of the Earth, Inc.*, 528 U.S. at 169. Because the Rosses did not allege an injury to themselves, their declaration cannot provide Sierra Club with associational standing. The district court erred in holding that the Rosses were injured by diminished recreational enjoyment of the lake.

The district court found that the Rosses provided evidence of a separate injury—the threat of swine waste drifting onto their property. The facilities' nutrient management plans showed that they planned to use a central pivot located about 200 feet from the Rosses' home to spray swine waste. At the time of the agency proceedings, the pivot was used for irrigation water, and the Rosses said that they "routinely felt the mist of the irrigation water as it drifted onto our property." They were concerned that if the permits were granted, swine waste would spray towards their house on breezy days, exposing them to bad smells and adverse health consequences.

Damage to health and property caused by the spray pivot, and possibly even the suffocating odors caused by the pivot if severe enough, would likely constitute a cognizable injury. The problem is that it must be probable that the injury will occur. *Moser*, 298 Kan. at 33 (stating that "the association or one of its members must have suffered cognizable injury or have been threatened with an impending, probable injury and the injury or threatened injury must be caused by the complained-of act or omission"). Allegations of possible future injury cannot satisfy the requirements of

36

standing. Unless there is a substantial probability of injury, the injury remains conjectural and not imminent. 298 Kan. at 33-34.

The reason the injury is merely conjectural is that KDHE tried to address the Rosses' concerns about spray drift. And KDHE's actions may have ameliorated the risk of spray drift. In response to the Rosses' concerns about spray drift, KDHE required Permittees to remove end guns on the center pivot, which would reduce the application of waste up to 120 feet, or to "provide a plan to KDHE detailing equivalent alternatives that will be implemented to avoid spray drift of swine waste onto non-owned property." Further, KDHE required the applicants to notify KDHE at least 24 hours before its first application of swine waste with the pivot so KDHE could observe the application. KDHE also noted that swine facilities are required by law "to use reasonable procedures and precautions to avoid spray drift from the land application site." See K.S.A. 65-1,182(f)(5)(B). It said that if the applicants' measures were inadequate, KDHE would require them to implement additional procedures and precautions. Given these steps, it does not seem probable that the Rosses' fears about spray drift will materialize.

As a final matter, Permittees cite another part of the associational standing test as a way to find that the Rosses cannot provide Sierra Club with standing to challenge the permits. For an association to have standing, "neither the claim asserted nor the relief requested requires participation of individual members." *Friends of Bethany Place*, 297 Kan. at 1126. Permittees argue that "to resolve the issue of whether the application of wastewater from the Norton County facilities will impermissibly expose the Rosses' home to wastewater drift or whether the facilities are too close to the Rosses' livestock pond will obviously require the Rosses to be involved." This confuses Sierra Club's burden to establish standing with its burden to establish KDHE erred in granting the permits. The "claim asserted" and "relief requested" mentioned in the associational standing test is referring to the substantive claim brought by Sierra Club in its petition for review. See *Moser*, 298 Kan. at 34-35 ("[N]either the claim asserted nor the relief

37

requested required the participation of individual members. FACT [Families Against Corporate Takeover] sought judicial review of an agency action, and the relief sought was revocation of the hog-farm permit. The analysis of whether the KDHE complied with the various rules and regulations involved in granting the permit did not require the participation of individual FACT members."). Here, the issue was whether KDHE correctly interpreted and applied the relevant laws in granting the four permits. The Rosses' participation was not required for Sierra Club to assert that claim or to receive relief.

*Conclusion*

The Kansas Supreme Court recently cautioned this court against opining on an appeal's merits when jurisdiction is lacking. *In re Estate of Lentz*, 312 Kan. 490, 504, 476 P.3d 1151 (2020). Since we find Sierra Club lacks standing to petition for review of KDHE's issuance of the original permits, we need not address the merits of the parties' arguments.

We reverse the district court's decision and remand with instructions to reinstate the original permits.

Reversed and remanded with directions.