No. 98,932

DONNA SCHLAIKJER, *Appellant*, v. JAMES D. KAPLAN, M.D.,
*Appellee*.
(293 P.3d 155)

Opinion filed January 25, 2013.

*Gerard D. Eftink*, of Van Hooser, Olsen & Eftink, of Raymore, Missouri, argued the cause, and *Patrick E. White*, of Kansas City, Missouri, was with him on the briefs for appellant.

*Bruce Keplinger*, of Norris & Keplinger, L.L.C., of Overland Park, argued the cause, and *John Hicks*, of the same firm, was with him on the brief for appellee.

*Per Curiam*: Plaintiff Donna Schlaikjer seeks reversal of the Court of Appeals' decision affirming summary judgment in favor of defendant James D. Kaplan, M.D. Schlaikjer sued Kaplan for medical malpractice arising out of surgeries to treat her tracheal stenosis. Kaplan filed a successful motion in limine to prevent Schlaikjer's subsequent treating physician and designated expert, Joel Cooper, M.D., from testifying about the standard of care. The district court granted the motion in limine because Cooper did not meet the requirements of K.S.A. 60-3412. In the absence of expert testimony on the standard of care, Schlaikjer could not, as a matter of law, carry her burden of proof; and summary judgment in Kaplan's favor followed.

The Court of Appeals affirmed the district court's summary judgment in favor of Kaplan. Schlaikjer now pursues four claims on petition for review to this court: (1) The 50 percent rule for expert witnesses under K.S.A. 60-3412 is inapplicable to treating physicians; (2) K.S.A. 60-3412 violates both the federal and state constitutions; (3) testimony of physicians on their treatment preferences may be used to prove standard of care in medical malpractice cases; and (4) the district court's grant of summary judgment was improper.

Because we hold that Schlaikjer's arguments on her first and fourth appellate claims require disposition of this appeal in her favor, we do not reach her constitutional challenges to K.S.A. 60-3412. See *Smith v. Kansas Dept. of Revenue*, 291 Kan. 510, 519, 242 P.3d 1179 (2010) (citing to *Wilson v. Sebelius*, 276 Kan. 87, 91, 72 P.3d 553 [2003]) (appellate courts avoid unnecessary constitutional decisions when alternative ground provides relief). We

discuss her third claim only because of the possibility that it will arise on remand.

## Factual and Procedural Background

Tracheal stenosis is a narrowing of the trachea that causes difficulty in breathing. As part of Schlaikjer's treatment for the condition, Kaplan, a pulmonary and critical care specialist, placed two metal stents in Schlaikjer's trachea—the first in September 2000 and the second in October 2001. The stents caused the development of granulation tissue that further obstructed Schlaikjer's trachea, and she continued to experience difficulty breathing. Kaplan referred Schlaikjer to Cooper when the stents failed to improve Schlaikjer's condition.

Cooper is a thoracic surgeon. He diagnosed Schlaikjer with a rare condition called idiopathic subglottic tracheal stenosis, which is a narrowing of the trachea below the vocal chords. Cooper removed the stents and performed a number of procedures to treat the damage he believed to have been caused by their placement. By March 2006, Cooper's treatment had fully resolved Schlaikjer's condition.

Schlaikjer sued Kaplan, alleging medical malpractice; failure to obtain informed consent; and misrepresentation about the ease with which the first stent could be removed, which induced her consent.

Schlaikjer filed her K.S.A. 60-226(b)(6)(B) expert witness designation with the district court, identifying Cooper as both her treating physician and her only expert witness. Cooper was deposed twice. During those depositions Cooper was asked to detail how he spent his professional time, but he expressed difficulty in providing exact figures. Cooper said he worked primarily in a teaching hospital, and much of his time spent as a teacher and researcher overlapped with time spent on direct patient care.

Specifically, the following exchange occurred during Cooper's first deposition:

"Q. Over the last two years, have you been engaged in treating patients and working on patients' cases?
"A. That is correct.

"Q. About how many hours a week over the last couple of years have you been working on patients or patients' cases?

"A. If—of course my activities involve operating time and seeing patients in an outpatient setting. If you add all of that together, they would probably add up to 25 hours a week.

"Q. Do you also teach medical school?

"A. Yes, I do. I teach primarily residents in training for—for training in general surgery and thoracic surgery. My actual medical school activities are limited to one or two lectures a year.

"Q. Okay. So do you put in over 50 percent of your professional time working on patients or seeing patients?

. . . .

"A. Yes—no. When I calculate my total work hours, the amount of time I devote to clinical practice—remember, we're talking about an 80 hour or 90 hour work-week. I believe that about 25 percent of my time is direct clinical activity. The remaining 75 percent, there's administration research and *teaching effort* which involves clinical conferences and *working with residents and fellows*.

"Q. How much on average each week are you spending in the classroom strictly teaching?

"A. My classroom is the operating room and the clinic. I do not spend time in the classroom except for rare lectures to medical students once or twice a year.

"Q. Okay. So when you're teaching, usually you're in the operating room teaching—

"A. Correct.

"Q. —by operating on a person?

"A. That is correct. Most—most surgical training is really an apprenticeship.

"Q. Okay. So when you say 25 hours a week on average working on clinical cases, does the include the time that you're teaching by being in a clinical setting working on a patient?

"A. Some of that is teaching time. If I'm in the operating room twice a week for eight hours each time, I am with a resident, and so I'm delivering patient care, but at the same time there's a teaching component. Additional activities involve seeing patients in an outpatient setting usually without the resident, and then of course there's time spent with the residents and fellows when there are no patients involved.

"Q. About what percentage of your time on average each week is involved in administrative[?]

"A. I would say 30 percent of my time has been involved in administrative activities until recently.

"Q. Has it been that way over the last five years?

"A. Yes, sir."

Cooper's second deposition included the following exchange:

"Q. Dr. Cooper, I wanted to ask you about your practice during the two years before September 18, 2000.

"A. Yes.

"Q. The time covering September 18, 1998 through September 18, 2000.

"A. Yes.

"Q. First of all, your profession at that time was as a medical doctor, correct?

"A. Yes, if you'll allow a surgeon to be so considered.

"Q. During that two-year period, September 18, 1998 through September 18, 2000, was over half of your time spent in actual clinical practice?

. . . .

"A. . . . Since the beginning of my career in 1972 I have been in full-time practice in an academic setting. So I have never had a limited practice or been a part-time practitioner. I have always been a full-time clinician in an academic setting, understanding that that means that my clinical practice and the time devoted to it comes first. But like all individuals in an academic practice we are not working a 40-hour work week. There is a great deal of additional activity that I do in training and teaching surgeons, doing administration of the division and doing research. So, if you ask me, do I spend full-time in practice, the answer is yes. Do I also, at the same time, have additional activities which extend my work week in hours beyond what one would normally consider a regular work week, the answer is absolutely, as most people do in academic practice.

"Q. During that time that I mentioned, that two-year period before September 18, 2000, did you have a regular schedule in which you saw patients?

"A. Yes, I do. And as the other members of our division, most of us have a similar schedule. I operate two days a week. I saw new patients, that was Monday and Wednesday. I saw new patients on Tuesday morning. I saw emphysema patients on Tuesday afternoon, and I saw follow-up patients on Friday.

"Q. You said you did surgery—what days of the week did you do surgery at that time?

"A. Generally on Mondays and Wednesdays.

"Q. Now, we are talking about that two years before—

"A. Yes, that's been my schedule for many, many years and has been the schedule of other members of my division, usually two days of operating time and then an additional day, day and-a-half of seeing patients, both outpatients and inpatients.

"Q. Okay. So that would be about four and-a-half days a week you were working directly with patients?

"A. Correct. Remembering that when you're in an academic institution working with patients is one of the modes by which you teach and train.

"Q. Again, referring to that two-year period before September 18, 2000, did you spend any time teaching in the classroom as opposed to in the operating room for direct patient care[?]

"A. No. My classroom teaching was limited to one or at most two lectures a year. The teaching that I do is hands-on teaching. My practice is in academic institution. It is in the operating room, training residents and fellows, having them come to

see patients with me, making ward rounds on the patients, and conducting several sessions a week, usually an hour each, in which patient care is discussed, patient cases are presented and discussed in terms of how one approaches the problem and how one approaches diagnosis and treatment of various clinical conditions in thoracic surgery.

"Q. Okay. If we define actual clinical practice to mean any work in your profession as a medical doctor where you either see patients or assist other medical personnel with their patients, including consulting with other medical personnel about their patients, operating or assisting other medical personnel in operating, reviewing files on patients or consulting with others about their patients, that two-year period, can you give us an idea of what percentage of your time as a medical doctor was spent in actual clinical practice?

. . . .

"A. I know the issue that you're asking me about, and, again, I'm not trying to be less than forthright. My primary role was as a clinician. But as a clinician and practicing physician in an academic center I had a dual [role], and much of my seeing patients, looking at x-rays, discussing patients, bedside teaching, operating teaching, it revolves around patient care. And is very difficult to sort out what component of that one can attribute to education, and what component you can contribute to clinical care.

"Second of all, I work seven days a week. I write papers. I do editorial work. I generally work a 12 to 14 hour day. There are very few weekend days that I am not there.

"So if you—the difficulty I have in answering your question is that all of those extra hours that one spends are to allow one to have a full-time practice and at the same time conduct the various important roles that one has as an editor, a writer, a reviewer and a researcher. So I spend many hours doing things other than the specifics of clinical practice, and yet I consider myself and have been throughout my career primarily a clinical academic surgeon.

"I know I haven't answered your question because it is difficult to say how you want me to define my role. Do you want me to tell you all of the hours I work each week and what percentage of those might be nonpatient related activities? Almost everything I do has either direct or indirect influence on patient care.

"Q. During that two-year period that we mentioned, can you give us an idea how much of your time was spent acting as an expert witness in litigation?

"A. Yes. I will choose several cases a year. I would say the most perhaps is four to five in a year, where people have brought to my attention a case and I will then choose those cases where I feel that I, because of my clinical knowledge and experience, have something to offer in an educational role to both sides. So I would say probably maximum of five in a year, more likely three.

"Q. But my question was about the two-year period before September 18th, 2000.

"A. I think that would be like any other year, they would perhaps be anywhere from three to four cases a year that I might agree to give an expert opinion on."

Kaplan filed a motion in limine seeking to exclude any standard of care opinions from Cooper. He argued that Schlaikjer could not show that Cooper met the 50 percent requirement of K.S.A. 60-3412, because Cooper had declined to state affirmatively that he spent at least that much of his professional time in actual clinical practice. Kaplan's motion also requested that the court exclude any standard of care testimony from the parties' expert witnesses about their personal treatment preferences.

After a hearing on the motion, the district court excluded any testimony by Cooper on the standard of care. The court's written ruling, after stating that a later-filed affidavit of Cooper would not be considered, read in pertinent part:

"Dr. Cooper is obviously a highly regarded physician with eminent qualifications. According to his deposition testimony, from 1998 to 2000 he engaged in 80- to 90-hour workweeks as a professor of surgery at the Washington University School of Medicine in St. Louis, Missouri. During these 80- to 90-hour workweeks, Dr. Cooper would spend 'about 25 percent of [the] time [in] direct clinical activity.' The remaining 75 percent of his workweek was spent in 'administration, research, and teaching effort, which involves clinical conferences and working with residents and fellows.'

"Much of Dr. Cooper's teaching occurred in a clinical setting while providing medical services to patients. Dr. Cooper did not give an estimate as to the percentage of work hours he spent teaching each week, nor did he estimate what percentage of the hours that he spent teaching were spent in the provision of medical services to patients. He did say, however, that he spent 30 percent of his workweek in administrative activities. Cooper also stated that 'around 20 percent' of his workweek was spent in research and as a reviewer for professional journals, and one to two percent was spent in 'medical legal review' similar to his work in the present case.

". . . The deposition testimony . . . fails to indicate how the '20 percent' of his workweek that he would spend 'in research and as a reviewer for professional journals' should be allocated between the two activities.

"Thus, . . . Dr. Cooper's . . . 80- 90-hour workweeks between 1998 and 2000 break down as follows:
(1) About 25 percent of his workweek was spent in direct clinical activity.
(2) Thirty percent was spent in administrative activities.
(3) Twenty percent was spent in research *and* as a reviewer for professional journals, though what portion of the 20 percent that is attributable to each of the two activities is not specified. The unspecified time 'in research' was divided—at a ratio also left unstated—between 'clinical research' and 'laboratory research.'
(4) One to two percent was spent in 'medical legal review.'

(5) Some unspecified portion of the 23 to 24 percent remaining would be spent teaching. Of the unspecified time spent teaching, some unspecified portion would be spent with patients.

". . . [P]laintiff has not met her burden to show that Dr. Cooper is qualified under K.S.A. 60-3412. Plaintiff has only shown a range of percentages that might be true—and the range begins at a point well below 50 percent. This is not a motion for summary judgment under which the evidence must be construed in the light most favorable to plaintiff. Rather, this is a question of the admissibility of evidence at trial, one in which the evidence sought to be presented to the jury has already been fully taken and set forth in the deposition transcripts.

". . . Dr. Cooper either does—or does not—meet the test set forth under the statute. If he does not, he may not offer an opinion on standard of care. Plaintiff has not met the burden to show that he meets that standard and, thus, his testimony on that point may not be presented to the jury."

The district court also ruled that neither party's physician witnesses could give standard of care testimony on direct examination based on their personal treatment preferences. If, for example, evidence of personal treatment preferences were admitted through cross-examination attacking an expert's credibility, a limiting instruction might be required.

Kaplan then moved for summary judgment, which the district court granted after rebuffing Schlaikjer's request that it reconsider its limine ruling. The Court of Appeals affirmed the summary judgment, and we granted Schlaikjer's petition for review.

ANALYSIS

*Applicability of K.S.A. 60-3412 to Treating Physicians*

Schlaikjer argues that the district court erroneously applied the requirements of K.S.A. 60-3412 to limit Cooper's testimony on standard of care. She complains that the statute's plain language restricts only who may testify as an expert and does not limit the testimony of treating physicians. In addition, she contends that the legislature's intent when enacting K.S.A. 60-3412 was to prevent testimony from "hired guns" who do not maintain regular clinical practice. In her view, the admissibility of a treating physician's opinion testimony should be governed instead only by K.S.A. 60-456, which addresses admission of opinion testimony generally.

When a "district court's decision to admit expert testimony is based upon an interpretation of the statute, the court has de novo

review." *Dawson v. Prager*, 276 Kan. 373, 376, 76 P.3d 1036 (2003).

"The interpretation of statutes is a question of law over which an appellate court exercises unlimited review. When courts are called upon to interpret statutes, the fundamental rule governing that interpretation is that the intent of the legislature governs if that intent can be ascertained. The legislature is presumed to have expressed its intent through the language of the statutory scheme it enacted. For this reason, when the language of a statute is plain and unambiguous, courts need not resort to statutory construction. Instead, an appellate court is bound to implement the legislature's expressed intent. Only where the face of the statute leaves its construction uncertain may the court look to the historical background of the enactment, the circumstances attending its passage, the purpose to be accomplished, and the effect the statute may have under the various constructions suggested." *State v. Arnett*, 290 Kan. 41, Syl. ¶ 1, 223 P.3d 780 (2010).

In medical malpractice cases, expert testimony is required to show a deviation from the standard of care if the subject matter falls outside the common, everyday knowledge of the average juror. *Dawson*, 276 Kan. at 375; *Webb v. Lungstrum*, 223 Kan. 487, 490, 575 P.2d 22 (1978). If the common knowledge exception applies, "such facts may be testified to by persons other than physicians." *Webb*, 223 Kan. at 490; see, *e.g.*, *Rule v. Cheeseman*, 181 Kan. 957, 317 P.2d 472 (1957) (expert standard of care testimony unnecessary when surgeon left gauze inside patient).

This lawsuit does not arise in a common knowledge situation. The appropriate treatment of tracheal stenosis is not within the experience, education, or everyday knowledge of the average juror. Thus expert testimony on the standard of care is necessary. See *Chandler v. Neosho Memorial Hospital*, 223 Kan. 1, 3, 5, 574 P.2d 136 (1977) (generally, expert testimony required to establish standard of care, deviation from standard); *Funke v. Fieldman*, 212 Kan. 524, 530, 512 P.2d 539 (1973) (same); see also *Bacon v. Mercy Hosp. of Ft. Scott*, 243 Kan. 303, 307, 756 P.2d 416 (1988) (expert testimony necessary to establish causation). K.S.A. 60-3412 explicitly governs the qualifications of such experts, providing:

"In any medical malpractice liability action, as defined in K.S.A. 60-3401 and amendments thereto, in which the standard of care given by a practitioner of the healing arts is at issue, *no person shall qualify as an expert witness on such issue unless at least 50% of such person's professional time within the two-year period*

*preceding the incident giving rise to the action is devoted to actual clinical practice* in the same profession in which the defendant is licensed." (Emphasis added.)

The plain language of the statute makes no exception for treating physicians. Under the statute, Cooper must have spent at least 50 percent of his professional time within the 2 years before Schlaikjer's first tracheal stent surgery in actual clinical practice, if Schlaikjer wishes him to testify as an expert on the applicable standard of care. *Williams v. Lawton*, 288 Kan. 768, 810, 207 P.3d 1027 (2009); *Dawson*, 276 Kan. at 375.

In essence, Schlaikjer wants this court to read an exception for treating physicians into K.S.A. 60-3412. But it is not our practice to manufacture judicial exceptions to plain and unambiguous statutory language. In such situations, we do not engage in statutory construction; rather, we implement the legislature's clearly expressed intent. *Arnett*, 290 Kan. 41, Syl. ¶ 1.

K.S.A. 60-3412 is not ambiguous. *Williams*, 288 Kan. at 809 ("[W]e need not delve into legislative history because the language of K.S.A. 60-3412 is not ambiguous."). It commands that *"no person* shall qualify as an expert witness" on the standard of care in a medical malpractice liability action "unless at least 50% of such person's professional time within the two-year period preceding the incident . . . is devoted to actual clinical practice." (Emphasis added.) This command covers treating physicians as well as witnesses hired by a litigant for the sole purpose of testifying.

Schlaikjer's effort to direct us to K.S.A. 60-456 rather than K.S.A. 60-3412 to bolster her case for a treating physician exception is unavailing. K.S.A. 60-456 provides in relevant part:

"(a) If the witness is not testifying as an expert his or her testimony in the form of opinions or inferences is limited to such opinions or inferences as the judge finds (a) may be rationally based on the perception of the witness and (b) are helpful to a clearer understanding of his or her testimony.

"(b) If the witness is testifying as an expert, testimony of the witness in the form of opinions or inferences is limited to such opinions as the judge finds are (1) based on facts or data perceived by or personally known or made known to the witness at the hearing and (2) within the scope of the special knowledge, skill, experience or training possessed by the witness.

. . . .

"(d) Testimony in the form of opinions or inferences otherwise admissible under this article is not objectionable because it embraces the ultimate issue or issues to be decided by the trier of the fact."

Schlaikjer points to authority suggesting that an "expert witness" covered by K.S.A. 60-3412 is typically a medical-legal consultant whose connection with the case began during trial preparation, as opposed to a treating physician or other person with specialized knowledge who was involved with the facts of the case. See *Moore v. Associated Material & Supply Co.*, 263 Kan. 226, 244-45, 948 P.2d 652 (1997) (inspector who investigated flooding could properly testify to his opinions incidental to his knowledge, involvement of the case); *Thompson v. KFB Ins. Co.*, 252 Kan. 1010, 1026-27, 850 P.2d 773 (1993) (medical witnesses who provided treatment to plaintiff properly allowed to testify despite plaintiff's failure to supplement discovery responses in accordance with K.S.A. 60-226[e]); *West v. Martin*, 11 Kan. App. 2d 55, 58, 713 P.2d 957 (1986) (district court abused its discretion by excluding plaintiff's treating physician's expert opinion when physician identified but plaintiff did not fully comply with K.S.A. 60-226).

None of these cases is particularly helpful to Schlaikjer, as each centered on sufficiency of compliance with discovery rules in order to determine whether an expert should be permitted to testify. None addressed the qualifications of the expert under K.S.A. 60-3412; and one, *West*, predated enactment of that statute.

Moreover, it is a longstanding rule that when there is an apparent conflict between a statute dealing generally with a subject and a statute specifically addressing the subject, the specific statute controls. See *In re Tax Exemption Application of Mental Health Ass'n of the Heartland*, 289 Kan. 1209, 1215, 221 P.3d 580 (2009). K.S.A. 60-456 addresses opinion evidence generally. K.S.A. 60-3412 specifically addresses a far narrower topic: the qualifications required of an expert witness who would testify on the standard of care in a medical malpractice practice case. It is obvious that K.S.A. 60-3412 is the more specific statute and is controlling.

We therefore hold that the requirements of K.S.A. 60-3412 apply to any witness who would give expert testimony on the standard of care in a medical malpractice action, regardless of whether the

prospective witness is a treating physician. The district court did not err on this point of law.

*Propriety of Summary Judgment*

The district court granted Kaplan's motion for summary judgment because its motion in limine ruling left Schlaikjer without expert testimony to establish the standard of care necessary to prevail on her causes of action. Thus, although Schlaikjer frames this appellate claim as a challenge to summary judgment, her arguments that the district court misconstrued Cooper's testimony and/or misapplied K.S.A. 60-3412 actually require review of the district court's ruling on the motion in limine. If, as Schlaikjer suggests, the district court misconstrued the testimony or misapplied K.S.A. 60-3412 in its limine ruling, then the summary judgment that was its inevitable offspring must be reversed. We therefore employ the standards of review applicable to motions in limine rather than those applicable to motions for summary judgment.

A district court's decision on a motion in limine involves a two-prong test. To grant the motion, the court must determine that (1) the material or evidence in question will be inadmissible at trial; and (2) a pretrial ruling is justified, as opposed to a ruling during trial, because (a) the mere offer or mention of the evidence during trial may cause unfair prejudice, confuse the issues, or mislead the jury; (b) the consideration of the issue during trial might unduly interrupt and delay the trial; or (c) a ruling in advance of trial may limit issues and save the parties time, effort, and cost in trial preparation. *State v. Shadden*, 290 Kan. 803, 816, 235 P.3d 436 (2010).

Schlaikjer's appellate claim does not question the district court's performance of its function on the second prong of the motion in limine test. It questions only the admissibility of Cooper's expert opinion on standard of care. When a district court's decision on the admissibility prong is based on interpretation of a statute, an appellate court exercises de novo review of that interpretation. *Dawson*, 276 Kan. at 376. In our discussion of Schlaikjer's first appellate claim, we conducted that review and established that the district court was correct about the applicable legal standard under K.S.A. 60-3412.

But the district court also had to make at least an implicit finding of fact about Cooper's compliance with that standard, *i.e.*, whether at least 50 percent of his professional time in the 2 years preceding the first stent surgery was devoted to "actual clinical practice." K.S.A. 60-3412. It is this factual finding with which Schlaikjer actually takes issue. On appeal, we generally review district court findings of fact to determine whether they were supported by substantial competent evidence. See *Hodges v. Johnson*, 288 Kan. 56, 65, 288 P.3d 1251 (2009). And that is the standard appropriate here. We therefore examine the record before the district court and, now, before us, to decide whether the district court's finding that Cooper failed to meet the 50 percent standard was error.

Actual clinical practice means "patient care." However, "patient care" is not limited to care delivered face-to-face or in the patient's physical presence. It also includes "advising on" or "addressing" care for a patient; each of these activities is encompassed within the definition of "actual clinical practice." *Dawson*, 276 Kan. at 376 (citing *Endorf v. Bohlender*, 26 Kan. App. 2d 855, 865, 995 P.2d 896, *rev. denied* 269 Kan. 932 [2000]).

Here, Cooper testified that the surgical residencies in which he participated as a teacher during the relevant 2 years were equivalent to hands-on apprenticeships and that his usual "classroom" was the operating theater. Cooper's administrative work was limited to 30 percent of his professional time. His time spent on research and review of professional journals fluctuated over the course of any given year but did not total more than approximately 20 percent; and the time he spent on medical-legal consulting reached no more than 1 percent to 2 percent.

As the district court acknowledged, some portion of Cooper's research time was categorized as clinical. In other words, it facilitated patient care. Cooper also testified that he was always a "full-time clinician in an academic setting," that he was in the operating room 2 full days a week, that he saw new patients one morning a week, that he saw emphysema patients one afternoon a week, and that he saw follow-up patients on yet another day each week. In short, "almost everything" Cooper did during his 80- to 90-hour

work weeks had "either direct or indirect influence on patient care."

On this record, we simply fail to see substantial competent evidence to support the district court's fact finding that Cooper did not spend at least 50 percent of his time in actual clinical practice. His testimony supported at least 3½ days to 4 days of each 7-day week on direct patient care. Hands-on resident supervision and consultation and his own clinical research necessary to provide patient care accounted for still more of his professional workweek. In our view, evaluation of whether he met the 50 percent requirement of K.S.A. 60-3412 required more than adding his imprecise estimates of 30 percent, 20 percent, and 1 percent to 2 percent. It required a holistic reading of his description of his clinical practice in an academic setting, including all of his varied patient care activities.

Because Cooper's testimony on the applicable standard of care should have been ruled admissible by the district court, Kaplan's motion for summary judgment should have been denied.

*Admissibility of Standard of Care Evidence on Physician Treatment Preferences*

Finally, Kaplan sought to exclude expert standard of care testimony based on physician treatment preferences. Again, we address this issue because of the possibility that it will arise on remand.

The district court agreed with part of Kaplan's motion in limine argument on this issue, ruling that such testimony could not be introduced by either party on direct examination of its expert witnesses to prove the standard of care. The court held open the possibility that treatment preferences could be explored on cross-examination, however, in order to test credibility. In such an event, the district court stated, a limiting instruction might be in order.

We agree with the district court's approach, as it is consistent with our decision in *Karrigan v. Nazareth Convent & Academy, Inc.*, 212 Kan. 44, 50, 510 P.2d 190 (1973).

*Karrigan* was a medical malpractice action based on post-operative care, in which the district court entered a directed verdict because the plaintiff had not introduced expert testimony to estab-

lish the applicable standard of care or breach of it. The plaintiff's witness said only that it was his practice to check post-operative patients more frequently than the defendant had. He stopped short of testifying that defendant's methods constituted unsound medical practice. Such evidence was inadmissible and "insufficient to establish . . . the 'degree of learning and skill ordinarily possessed by members of his profession and of his school of medicine in the community where he practices or similar communities.'" *Karrigan*, 212 Kan. at 50.

The Court of Appeals followed our *Karrigan* rationale in *Cox v. Lesko*, 23 Kan. App. 2d 794, 797-99, 935 P.2d 1086 (1997), *aff'd in part and rev'd in part on other grounds* 263 Kan. 805, 953 P.2d 1033 (1998). In that case, the plaintiff claimed it was error for the district court to restrict her cross-examination of the defendant's expert on his preferred method of treatment. She contended that such evidence would have been relevant to establish the applicable standard of care in treating the type of injury she sustained. *Cox*, 23 Kan. App. 2d at 797-98.

The Court of Appeals disagreed:

"To allow [the plaintiff] to cross-examine [the expert] on how he preferred to treat these types of shoulder injuries would unduly emphasize one approach over another and was not relevant in determining whether Dr. Lesko deviated from the appropriate standard of care." *Cox*, 23 Kan. App. 2d at 798-99.

See also *Nold v. Binyon*, 272 Kan. 87, 100, 31 P.3d 274 (2001) ("*Cox* found it improper for a doctor to testify regarding his or her own preferred method of treatment in determining whether another doctor deviated from the appropriate standard of care.").

In this case, the district court was correct to grant Kaplan's motion in limine insofar as it addressed physician preference testimony admitted on direct examination for the purpose of proving the applicable standard of care. It may be that such testimony is admissible for another purpose, for example, as the district court pointed out, on cross-examination to impeach credibility; but we decline to further address this theoretical possibility at this procedural juncture in this particular case.

## Conclusion

The district court was correct in ruling that treating physician Cooper's expert testimony on standard of care was subject to the 50 percent requirement in K.S.A. 60-3412. However, the summary judgment of the district court in Kaplan's favor must be reversed and the case remanded for further proceedings because the record does not support the district judge's ruling that Cooper failed to meet the 50 percent requirement. We also hold that the district court was correct in its ruling on the inadmissibility of direct testimony about physician treatment preferences to prove the applicable standard of medical care. This holding will guide the parties' presentation of evidence at any eventual trial, as well as inform the district judge's instructions to the jury. Having granted Schlaikjer the relief she sought through our interpretation and application of the statute, we do not reach her constitutional challenges to it.

The judgment of the Court of Appeals is reversed. The judgment of the district court is reversed, and the case is remanded for further proceedings consistent with this opinion.

DAVIS, C.J., not participating.

LARRY T. SOLOMON, District Judge, assigned.