NOT DESIGNATED FOR PUBLICATION

No. 128,827

IN THE COURT OF APPEALS OF THE STATE OF KANSAS

MICHELLE CROUCH,
*Appellant*,

v.

TODD B. SMITH,
*Appellee*.

MEMORANDUM OPINION

Appeal from Johnson District Court; CATHERINE DECENA TRIPLETT, judge. Oral argument held September 16, 2025. Opinion filed May 8, 2026. Affirmed.

*Linus L. Baker*, of Stilwell, for appellant.

*Brian J. Niceswanger* and *Stephanie A. Preut*, of Evans & Dixon, LLC, of Overland Park, for appellee.

Before WARNER, C.J., MALONE and CLINE, JJ.

WARNER, C.J.: Michelle Crouch appeals the district court's grant of summary judgment in favor of Todd Smith, M.D., on Crouch's medical malpractice claims following a shoulder surgery in 2020. After carefully reviewing the record, we find that the summary-judgment procedure used by the parties and district court was less than ideal in many respects. But the decision granting judgment was appropriate, as Crouch has not identified any causal link between any alleged deviation from the standard of care under these circumstances and her injuries. We affirm the district court's judgment.

FACTUAL AND PROCEDURAL BACKGROUND

In January 2020, Crouch fell while she was on vacation in Florida and fractured her right proximal humerus—the upper arm bone connected to her shoulder joint. Crouch went to the emergency room in Florida after the fall. But instead of undergoing surgery or other treatment, she asked the emergency room doctor to place her arm in a stabilizer sling so she could finish the remainder of her vacation.

Six days later, Crouch—at that point in Kansas—visited Dr. Todd Smith, an orthopedic surgeon with Johnson County Orthopedics and Sports Medicine in Olathe. Five days after that visit, Dr. Smith performed an open reduction and internal fixation surgery on Crouch (meaning he made an incision to realign the bone and placed metal hardware to hold it in place).

*Crouch's condition, treatment, and filing of the lawsuit*

Crouch began physical therapy roughly one month after the surgery. Despite the therapy and passage of time, her pain continued to increase and her range of movement did not improve. She expressed these problems to Dr. Smith in a series of follow-up appointments. Her petition alleges that she eventually obtained a copy of some X-ray records through her physical therapist, and these records showed screws protruding from the bone in her right shoulder.

In June 2020, Dr. Smith again spoke with Crouch and referred her to the University of Kansas Medical System (commonly referred to as KU Med) for further treatment. Crouch eventually underwent surgery for the total replacement of her right shoulder.

In October 2021, Crouch and her husband, Brian, filed a petition against Dr. Smith and Johnson County Orthopedics and Sports Medicine, alleging negligence and loss of consortium. (Brian and his loss of consortium claim were later dismissed from the lawsuit without prejudice.) In the petition, Crouch contended that Dr. Smith did not adequately advise Crouch of her alternative treatment options outside of the open reduction and internal fixation surgery; placed the metal hardware such that screw tips were protruding out of Crouch's bone; abandoned Crouch's care without giving her adequate notice to find a new doctor; and concealed from Crouch the fact that screws were protruding from her bone, which thus "delayed proper treatment and contributed to the arthritic change and current immobility [she] currently suffers from now."

Throughout a deposition and various interrogatories, Dr. Smith disputed Crouch's allegations. He stated that he remembered going through the risks of the surgery with Crouch and opined that even with "a surgeon operating with good judgment, skill, and prudence, as an inherent risk of this surgery, there can be screw penetration, which would not be a violation of the standard of care." Dr. Smith also stated that his first discussion with Crouch about the placement of the screws was on March 26, 2020, and on May 20 he reviewed the x-ray with Crouch, had another discussion with her about the penetration of screws, discussed the treatment options, and answered Crouch's questions. Lastly, he stated he recommended Crouch obtain a consultation with a fellowship-trained orthopedic specialist at KU Med due to the complexity of her case and explained that the Olathe healthcare system did not have a similarly trained specialist. Crouch agreed, and Dr. Smith assisted her in obtaining a copy of her medical records and images, then referred her to the specialist (who provided additional treatment and performed the shoulder-replacement surgery).

3

*Dr. Smith's motion for summary judgment and the six months of briefing that followed*

In May 2023, roughly 19 months into the lawsuit, Dr. Smith's attorneys sent a draft case management order to Crouch's attorney for Crouch's review and approval. This draft order included a deadline that Crouch must designate an expert witness on or before September 15, 2023. The order was never approved by the parties or submitted to the court. In October 2023, one of Dr. Smith's attorneys emailed Crouch's counsel, acknowledging that the order was never filed with the court but asking if Crouch had any experts to support the claims in her case. Crouch's counsel replied that he was in a jury trial at the moment and planned to provide an expert report by the end of November.

When Crouch still had not provided any expert report by the following January, Dr. Smith filed a motion for summary judgment. The brief in support of the motion included 10 statements of facts that he alleged were uncontroverted and controlled the case, including his sworn opinion that "the care and treatment which was provided to Ms. Crouch by him was within the standard of care or, in other words, in line with what a reasonable physician would do under the same or similar circumstances" and "no breach in the standard of care by him caused or contributed to cause [Crouch's] claimed damages." The motion argued that Crouch had not provided any evidence to contradict these statements.

The following month, Crouch produced a six-page expert report from Jerome G. Piontek, M.D., an orthopedic surgeon who had retired from clinical practice and now worked as a medical consultant for the Disability Determination Section of Social Security in Missouri. The report generally discussed Dr. Piontek's background but did not include or attach a curriculum vitae summarizing his credentials.

Dr. Piontek's report largely summarized the history of Crouch's injury and the medical records he had reviewed. And it closed with the following two paragraphs:

4

"The Standard of Care stipulates that a healthcare provider provide the level of care a similarly trained professional would have offered under the same circumstances. This standard also requires that the patient be given appropriate information regarding the plan of treatment, alternatives, and risks in order for them to make an informed consent. In addition the Standard requires that the patient be informed of complications, as well as unexpected, and or problematic outcomes.

"Ms. Crouch's fracture could have, and should have been treated non operatively. The best result, and best chance for healing would have been with nonoperative treatment. The decision to operate led to further disruption and displacement of the fracture fragments, potential disruption of blood supply to the fragments, and problems related to hardware position. There is no clear evidence that Ms. Crouch was informed of the intraarticular penetration of the screws in a timely fashion. Nor is it clear that she was informed of the deterioration of the alignment and fixation in a timely fashion. Dr. Smith's operative treatment of Ms. Crouch was the sole cause in requiring her to have further surgeries, including Reverse Total Shoulder Replacement, and to undergo a prolonged and painful rehabilitation and recovery process. Her treatment, and the lack of the timely provision of information to her by Dr. Smith, represent clear violations of the Standard of Care."

Crouch then responded to Dr. Smith's motion for summary judgment, arguing (primarily based on Dr. Piontek's expert report) that factual issues persisted as to whether Dr. Smith's actions violated the standard of care for a medical doctor under these circumstances. Crouch's response addressed the 10 factual allegations listed in Dr. Smith's motion as though they were requests for admission in discovery, rather than a summary-judgment motion—stating that she either *admitted* or *denied* the allegations, instead of explaining whether the statements were *uncontroverted* or *controverted*.

To support each admission or denial, Crouch did not provide pinpoint citations to specific statements in the record attached to the motion or response. Rather, she included broad references to whole exhibits without any reference to page, line, or paragraph numbers, or any discussion of how those exhibits controverted Dr. Smith's facts. For

5

example, when responding to a factual statement regarding Dr. Smith's qualifications and the treatment provided, Crouch cited "Ex. 1 (Dr. Piontek Opinion) Ex. 2 (Sworn Statement of Michelle Crouch) Ex. 3 (Deposition of Michelle Crouch)." We note that the transcript from Crouch's deposition was 271 pages in length. Most of Crouch's denials of the allegations cited to "Ex. 1"—Dr. Piontek's expert report.

Crouch's response also included 39 additional factual allegations that largely told the story of Crouch's injury and treatment from her perspective, based primarily on her own affidavit and her deposition testimony, and summarized her claimed damages.

Dr. Smith filed a reply to this response a few weeks later in March 2024. In the reply, he responded to Crouch's additional factual allegations, stating whether each was controverted, uncontroverted, or extraneous to the issue presented in the motion for summary judgment. He argued that Crouch's responses to his factual allegations did not comply with Supreme Court Rule 141 (2026 Kan. S. Ct. R. at 220), as those allegations did not provide pinpoint citations to evidence showing each allegation was disputed or explain the point of disagreement; he thus urged the district court to treat the allegations as essentially uncontroverted. He also argued that the court should not consider Dr. Piontek's expert report because Crouch had filed it after the proposed September 15, 2023, deadline in the previous draft case management order. And Dr. Smith claimed the opinions in the report did not meet Kansas requirements for medical certainty or reliability and did not show Piontek was qualified as an expert on the standard of care.

Four months passed.

In mid-July, Crouch filed a motion for leave to file a sur-reply to respond to the allegations in Dr. Smith's March filing. This July motion, which itself included the sur-reply arguments, attached Dr. Piontek's CV and an affidavit stating that "[a]t least 50% of my professional time within the two-year period preceding the incident giving rise to the

action was devoted to actual clinical practice in the same profession in which the defendant Dr. Todd Smith was licensed." Crouch also challenged Dr. Smith's allegations about the absence of evidence showing any alleged breach of the standard of care by Dr. Smith caused Crouch's injuries. She argued that causation can be shown by circumstantial evidence and drawn from reasonable inferences. And she asserted that "Dr. Piontek's Report connects the acts and omissions of Dr. Smith to the cause of Ms. Crouch's injuries."

*The district court's ruling*

The district court ultimately granted the motion for summary judgment. It announced its ruling at a hearing in September 2024 and followed that oral pronouncement with a written decision in December.

At the hearing, the court explicitly declined to find that Crouch's disclosure of Dr. Piontek's expert report was untimely. The court noted that regardless of whether the parties had discussed a schedule for the case, there was no case management order on file. The court emphasized that even though the case had been pending for three years, the scheduled trial was not until in February 2025; Dr. Smith could not have suffered any real prejudice when he received the expert one year before that.

The court then turned to Dr. Piontek's expert report. The court questioned whether Crouch had provided sufficient information demonstrating that the report could be admitted at trial. The court mentioned that it was unaware whether Crouch had provided a CV showing that Dr. Piontek had the necessary contemporary practice experience to opine on the standard of care applicable to Dr. Smith's actions. And the court noted that it was Crouch who had the burden to provide reliable medical evidence as to each of the elements of her medical malpractice claim.

7

The court went on to conclude, however, that even if the expert report were admissible, the report was insufficient to overcome a motion for summary judgment. In particular, the court emphasized that while there was "some language" in the report relating to the standard of care, the report lacked any "clear indication of causation." The court found that Crouch's allegations in the sur-reply relating to common knowledge were insufficient here, as Kansas caselaw demonstrates that "a bad outcome after surgery is not enough" to state a claim for medical malpractice. The court explained that there needed to be "more evidence to show causation other than a surgery was had and a bad outcome" resulted—something to "tie a deviation from the standard of care as it is alleged in the expert witness's disclosure to the damage complained [of] by the plaintiff." The court thus concluded that there was a "lack of expert testimony to show that negligence or a deviation from the standard of care caused [Crouch's] injuries."

The court also found that Crouch did not follow the procedural rules governing responses to alleged statements of uncontroverted fact in summary-judgment proceedings. The court explained that "it took the Court a little bit of time" to digest all the briefing because Crouch had not included "a more pointed paragraph showing the evidence" that would be relied upon at trial in Crouch's denials of Dr. Smith's factual allegations. The court indicated that even without this explanation, the court "just made [its] way through" the allegations and responses because it believed "that the plaintiff in this case deserved an actual good-faith effort . . . to look through the evidence to come to some sort of a conclusion." But the court found Crouch had failed to demonstrate "the bare-minimum standard of showing that . . . there is a deviation of the standard of care and that deviation specifically is the cause of the injury."

A few months later, the court memorialized its decision in a written order. That order did not address each factual allegation individually and did not discuss Crouch's additional factual allegations at all. Instead, it focused on Crouch's lack of compliance with Rule 141 and what the court perceived as admissibility issues surrounding

Dr. Piontek's expert report; and ultimately concluded that, because Crouch had not sufficiently complied with Rule 141, it would "deem[] all facts alleged by [Dr. Smith] as uncontroverted." The court indicated that it was adopting Dr. Smith's analysis in his motion and reply.

Crouch objected to the court's order, asking for more particularized findings of fact and conclusions of law. See Supreme Court Rule 165 (2026 Kan. S. Ct. R. at 232). She also moved to alter or amend the judgment. The district court denied Crouch's motion, emphasizing that "[i]t is not the responsibility of the Court to search through briefs and evidence to find arguments or evidence that support a party's position."

DISCUSSION

The procedures surrounding summary judgment test the legal tenability of a party's claims or defenses. Summary judgment—or judgment without a trial—is appropriate when "the pleadings, the discovery and disclosure materials on file, and any affidavits or declarations show that there is no genuine issue as to any material fact and that the [moving party] is entitled to judgment as a matter of law." K.S.A. 60-256(c)(2). To prevail on a motion for summary judgment, a party must show that there is nothing a factfinder could decide that would change the outcome of the case. *Shamberg, Johnson & Bergman, Chtd. v. Oliver*, 289 Kan. 891, 900, 220 P.3d 333 (2009). When a party opposing a motion for summary judgment points to evidence of a genuine factual question that remains unresolved, summary judgment should be denied. 289 Kan. at 900.

A district court considering a motion for summary judgment views the evidence in the light most favorable to the party opposing the motion, giving that party the benefit of every reasonable inference drawn from the evidentiary record. 289 Kan. at 900. But pointing to the absence of evidence on a subject, or speculating that evidence could later be presented to create a factual issue, is not sufficient to demonstrate that a case should

9

proceed to a trial. See *Stroud v. Ozark Nat'l Life Ins. Co.*, 320 Kan. 180, 184, 564 P.3d 725 (2025). Instead, a party opposing a summary-judgment motion must come forward with evidence to establish a dispute as to a material fact, and "'the facts subject to the dispute must be material to the conclusive issues in the case.'" 320 Kan. at 184.

On appeal, we apply the same framework as the district court, exercising de novo review. *Martin v. Naik*, 297 Kan. 241, 246, 300 P.3d 625 (2013). When we find that reasonable minds could differ as to the conclusions drawn from the evidence, summary judgment must be denied. *Becker v. The Bar Plan Mut. Ins. Co.*, 308 Kan. 1307, 1311, 429 P.3d 212 (2018); *Patterson v. Cowley County, Kansas*, 307 Kan. 616, 621, 413 P.3d 432 (2018).

As we have noted, the district court offered two primary explanations for its grant of summary judgment in this case.

- First, the court noted at the hearing and in its order that Crouch's responses to Dr. Smith's motion did not comply with Rule 141, which clarifies the procedures for parties seeking and opposing summary judgment in Kansas courts. Most notably, the court found that Crouch had not explained why any of Dr. Smith's factual allegations were disputed and had not directed the court to specific locations within the evidentiary record to demonstrate those disputes. The court thus deemed Dr. Smith's factual statements to be uncontroverted. These statements included allegations that Dr. Smith had not breached any standard of care that caused Crouch's injuries.

- Second, the court found at the hearing that Dr. Piontek's expert report did not establish a genuine factual question that defeated summary judgment. The court questioned whether Crouch had demonstrated that the report was admissible or that Dr. Piontek could be qualified as an expert in this area. But even assuming

10

that the report was otherwise admissible, the court noted that the report did not establish any causal connection between the "deviation from the standard of care" described by the report and "the damage complained [of] by the plaintiff."

Crouch raises two broad challenges on appeal. She argues that the district court erred in finding that she did not comply with Rule 141. And she asserts that Dr. Piontek's report identified a factual question as to whether Dr. Smith breached his duty of care and that such breach caused her injury, rendering summary judgment inappropriate. Our review of the record in this case demonstrates that the procedure employed here by both the parties and the district court was in many ways unusual and not a model of clarity or practice. But the court's second conclusion—that Crouch had not provided evidence that any deviation from the standard of care by Dr. Smith *caused* her injuries—is sound. We thus affirm the court's summary judgment.

1. *The summary-judgment process in this case deviated from Rule 141 in several respects.*

In Kansas, summary judgment is governed by K.S.A. 60-256. Relevant here, K.S.A. 60-256(c)(2) states that summary "judgment sought should be rendered if the pleadings, the discovery and disclosure materials on file, and any affidavits or declarations show that there is no genuine issue as to any material fact and that the movant is entitled to judgment as a matter of law." When the moving party has submitted a motion that is "properly made and supported," the opposing party "may not rely merely on allegations or denials in its own pleading." K.S.A. 60-256(e)(2). Rather, the opposing party's response "must . . . set out specific facts showing a genuine issue for trial." K.S.A. 60-256(e)(2). "If the opposing party does not so respond, summary judgment should, if appropriate, be entered against that party." K.S.A. 60-256(e)(2).

Rule 141 provides additional details regarding this burden-shifting procedure and the proofs that must be made when seeking and opposing summary judgment. Rule 141(a) states that a motion for summary judgment must be accompanied by a written memorandum that "states concisely, in separately numbered paragraphs, the uncontroverted contentions of fact on which the movant relies" and, "for each fact, contains precise references to pages, lines and/or paragraphs—or to a time frame if an electronic recording—of the portion of the record on which the movant relies." Rule 141(a)(1), (2) (2026 Kan. S. Ct. R. at 220). Rule 141(b) requires a written brief opposing summary judgment to

"(1) state—in separately numbered paragraphs that correspond to the numbered paragraphs of movant's memorandum or brief—whether each of movant's factual contentions is:
    (A) uncontroverted;
    (B) uncontroverted for purposes of the motion only; or
    (C) controverted, and if controverted:
        (i) concisely summarize the conflicting testimony or evidence and any additional genuine issues of material fact that preclude summary judgment; and
        (ii) provide precise references as required in subsection (a)(2)."

Rule 141(b)(1) (2026 Kan. S. Ct. R. at 220-21).

If a party opposing summary judgment does not comply with this procedure, a court may nevertheless deem the motion to be "finally submitted" and treat "the uncontroverted factual contentions stated in the moving party's memorandum [as] admitted." Rule 141(f)(2) (2026 Kan. S. Ct. R. at 221).

These procedures may seem unnecessarily formulaic to the untrained eye. But the Kansas Supreme Court has long emphasized that "Rule 141 is not just fluff—it means what it says and serves a necessary purpose." *McCullough v. Bethany Med. Center*, 235

Kan. 732, 736, 683 P.2d 1258 (1984), *superseded by statute on other grounds as stated in Roy v. Young*, 278 Kan. 244, 93 P.3d 712 (2004).

In particular, the requirements regarding the separate paragraphs for each factual allegation allow courts to meaningfully assess the core question presented at summary judgment—whether there is a genuine issue of material fact to be resolved at trial. The requirement that a movant provide all material and allegedly uncontroverted facts in separately numbered paragraphs allows a court to review and assess each statement, along with its evidentiary support. Similarly, the requirement that a party opposing summary judgment respond separately to each individual factual allegation, providing specific citations to the record as to why any allegations are controverted, allows the court to determine whether genuine factual disputes preclude judgment as a matter of law. Without this organized procedure, courts would have "no way to determine . . . what facts are or are not controverted or on what evidence the parties rely." *McCollough*, 235 Kan. at 736.

Crouch asserts that the district court's analysis under Rule 141 was erroneous in several respects. She asserts that the court's decision was motivated by the judge's belief that Crouch and her counsel had refused to file the draft case management order proposed in May 2023 in order to gain an advantage in the case. She also asserts that there is no meaningful difference between indicating that a proposed fact is "uncontroverted" or "controverted," as Rule 141 contemplates, or "admitted" or denied," as she indicated in her response. And she claims that her responses substantially complied with Rule 141 because it was obvious that she disagreed with Dr. Smith's factual allegations, and it was not overly burdensome for the district court to find the reason for that disagreement— even without any specific page or line citations—because Dr. Piontek's report was only six pages long.

As a preliminary matter, Crouch argues that despite the district court's statements to the contrary, its analysis was "infected" by the belief that Crouch had intentionally disregarded the draft case management order and thus Dr. Piontek's expert report was untimely. But although the court did question why Crouch had not taken any action regarding the draft order, the district court explicitly declined to find that the expert report was untimely. The court observed that it had not entered any case management order in the lawsuit, and the report was produced well before the scheduled trial date. We are unpersuaded by Crouch's claims that the unfiled case management order had any meaningful effect on the court's summary-judgment analysis.

Rather, our review of the record shows that the district court found Dr. Smith's facts uncontroverted—and thus summary judgment was appropriate—due to Crouch's "failure to properly controvert them." The court reached this conclusion because, first, Crouch did not answer whether or not each fact was controverted or uncontroverted (but rather stated whether she admitted or denied each allegation), and second, Crouch did not provide *specific* citations to controvert each fact.

Turning first to Crouch's admission or denial of the factual allegations, the Kansas Supreme Court has found that when a party opposing summary judgment "admitted, denied, or claimed it was without sufficient evidence to confirm or deny" each of the movant's statements of fact, the opposing party "substantially complied with Rule 141." *Calver v. Hinson*, 267 Kan. 369, 378, 982 P.2d 970 (1999). This makes sense, as the words hold very similar meanings. The deficiency in Crouch's responses is not in the specific language she used—*denying* a fact rather than claiming it is *controverted*—but in the lack of any explanation as to the reason for the dispute and the specific evidence supporting that rationale.

For each of Dr. Smith's allegations, Crouch's response stated "Admit" or "Deny" and then cited to a full exhibit (or multiple exhibits) ranging from 2 to 272 pages in

14

length. None of these responding paragraphs included a "concise[] summar[y of] the conflicting testimony or evidence" or otherwise explained the factual dispute. Rule 141(b)(1)(C)(i) (2026 Kan. S. Ct. R. at 221). Nor did they "provide precise references" to the record. Rule 141(b)(1)(C)(ii) (2026 Kan. S. Ct. R. at 221). Indeed, Crouch's responses to Dr. Smith's allegations are more akin to responses to requests for admissions during discovery than responses to a motion for summary judgment. See K.S.A. 60-236. As the district court noted, it is not the responsibility of a court faced with a summary-judgment motion to search through briefs and evidence to find arguments or facts that support each party's position.

Crouch next argues that even if her responses did not strictly comply with the procedure in Rule 141, the factual disputes in the case should have been clear to the district court. Crouch points out that most of her denials relied on Dr. Piontek's report. And even though that report was six pages long, the relevant portions relating to the standard of care and Crouch's injuries were limited to the report's final two paragraphs. In other words, Crouch contends that her response *substantially complied* with Rule 141.

We pause here to observe that the procedure used in this case bore little resemblance to the summary-judgment procedure contemplated by K.S.A. 60-256, Rule 141, and our governing caselaw. Some of the irregularities were undoubtedly caused by the absence of a governing case management order to prescribe the schedule for disclosing experts and providing expert reports, as well as the timeframe for conducting discovery and filing any dispositive motions. Dr. Smith attempts to lay the blame for this absence at Crouch's door, indicating that his attorneys provided a draft order to Crouch's attorney in May 2023—19 months into the litigation. Certainly, Crouch and her attorney could have, and should have, responded if they had concerns about the timelines proposed in that order. But Dr. Smith and his attorneys also had an obligation to follow up before October—after the proposed deadline for submitting expert disclosures had passed. The responsibility for moving the case forward is a shared one.

15

It is unsurprising that in the absence of a court-ordered schedule for things like expert designations and reports, a discovery cutoff, and a dispositive motion deadline, the summary judgment process here was far from ideal:

- Dr. Smith's motion for summary judgment, filed in January 2024, claimed that Crouch had not come forward with any evidence supporting her claim of medical malpractice. Accord *Northern Natural Gas Co. v. ONEOK Field Services Co.*, 296 Kan. 906, 935, 296 P.3d 1106 (2013) ("Ordinarily, summary judgment should not be granted until discovery is complete. However, if the facts pertinent to the material issues are not controverted, summary judgment may be appropriate even when discovery is unfinished.").

- Crouch provided Dr. Piontek's report a few weeks later and then responded to the motion. As the district court observed, despite Dr. Smith's arguments to the contrary, Crouch was entitled to produce the report at that time, as there was no contrary scheduling order filed. But the report undoubtedly changed the direction of the parties' arguments.

- Dr. Smith's reply, filed another month later, addressed Crouch's additional factual allegations and focused on Dr. Piontek's report, raising concerns regarding its admissibility and whether it provided the evidence necessary to state a prima facie case for medical malpractice.

- Four months later, Crouch filed a motion for leave to file a sur-reply—which itself contained the sur-reply arguments—primarily addressing the admissibility concerns and providing Dr. Piontek's CV. See *Rhoten v. Dickson*, 290 Kan. 92, 105, 223 P.3d 786 (2010) (summarizing caselaw finding that "a Rule 141 violation should not be considered fatal if the party complies with the rule in subsequent

filings before the district court renders judgment"). In its subsequent ruling from the bench, the district court correctly noted that neither K.S.A. 60-256 nor Rule 141 contemplates a sur-reply. But the court considered Crouch's arguments given the morphing nature of the parties' positions.

This procedure did not comport with the procedure or timing set forth in K.S.A. 60-256 or Rule 141. And the district court's consideration of the arguments was similarly unorthodox. The court conducted a hearing in September 2024 to announce its summary-judgment decision. The court found that Crouch's response did not comply with Rule 141 but indicated that it had nevertheless reviewed all the exhibits in order to understand the parties' arguments. The court did not address any of the factual allegations raised by Dr. Smith, except to state that Crouch had not sufficiently controverted them. It did not reference the additional facts offered by Crouch's response at all, even to find them immaterial. The court's explanation of its decision from the bench varied somewhat from its statements in the written order granting summary judgment, which used a more strident tone.

Our review shows that the confusion created by this extended and irregular process cannot be laid at the feet of any one party or the court. The district court was correct when it noted that Crouch's response and sur-reply did not strictly comply with Rule 141. But the court's conclusion in its written order that Crouch's lack of compliance with Rule 141 prevented meaningful review of the case seems precipitous—especially given the court's acknowledgement that it had reviewed Dr. Piontek's report and the court's alternative conclusion that the report did not provide a causal link necessary to make a prima facie showing of medical malpractice. Accord *City of Arkansas City v. Bruton*, 284 Kan. 815, 836-37, 166 P.3d 992 (2007) (noting that lack of strict compliance with Rule 141—or the court's failure to address every fact—does not compel an outcome when the court can identify the facts necessary to resolve the motion and undertake the correct legal analysis).

As we discuss in the following section, we find the district court's ruling regarding causation to be correct and dispositive of the issues in this appeal. Thus, we need not determine whether the court abused its discretion when it concluded Rule 141 provided an alternative basis for summary judgment. We only note, as previous courts have observed, the peril parties face when Rule 141's framework is disregarded. See Rule 141(f) (granting district courts discretion to deem a party opposing summary judgment as having admitted the uncontroverted facts in the movant's statement); see also *Slaymaker v. Westgate State Bank*, 241 Kan. 525, 531, 739 P.2d 444 (1987) ("A party whose lack of diligence frustrates the trial court's ability to determine whether factual issues are controverted falls squarely within the sanctions of Rule 141."); *Lopez v. Davila*, 63 Kan. App. 2d 147, 153, 526 P.3d 674 (2023) ("[O]ur courts have found that a party fails to comply with Supreme Court Rule 141 at its own peril."); *Business Opportunities Unlimited, Inc. v. Envirotech Heating & Cooling, Inc.*, 26 Kan. App. 2d 616, 618, 992 P.2d 1250 (1999) ("A party ignores Rule 141 at its peril.").

2. *Crouch provided no evidence that the breach of any standard of care caused her injuries.*

Questions of negligence, including claims of professional negligence like medical malpractice, tend to be fact-intensive inquiries. Courts have thus routinely observed that these claims generally "present factual determinations for the jury, not legal questions for the court." *Elstun v. Spangles, Inc.*, 289 Kan. 754, 757, 217 P.3d 450 (2009). For this reason, "'summary judgment is rarely appropriate'" in these cases. *Stroud*, 320 Kan. at 184.

But despite this general rule, summary judgment is proper when a plaintiff fails to establish a prima facie case as to one of the elements necessary to prove their case. 320 Kan. at 184. A plaintiff can establish a prima facie case by presenting "'evidence which,

18

if left unexplained or uncontradicted, would be sufficient to carry the case to the jury and sustain a verdict in favor of the plaintiff on the issue it supports.'" 320 Kan. at 184. There is "no genuine issue" of material fact—and thus no reason for a case to proceed past summary judgment—when a plaintiff fails to make this evidentiary showing as to "an essential element of their case." *Sharples v. Roberts*, 249 Kan. 286, 292, 816 P.2d 390 (1991); see *Drouhard-Nordhus v. Rosenquist*, 301 Kan. 618, 627, 345 P.3d 281 (2015) (holding that summary judgment was appropriate in a malpractice case when the plaintiff failed to provide evidence of causation).

To prevail on a medical malpractice claim, a plaintiff must provide evidence regarding four elements, demonstrating:

> "(1) The health care provider owed the patient a duty of care and was required to meet or exceed a certain standard of care to protect the patient from injury; (2) the provider breached this duty or deviated from the applicable standard of care; (3) the patient was injured; and (4) the injury proximately resulted from the breach of the standard of care." 301 Kan. at 623.

There are two components to the fourth element of proximate cause—causation in fact and legal causation. To establish causation in fact, a plaintiff must prove "a cause-and-effect relationship between a defendant's conduct and the plaintiff's loss by presenting sufficient evidence from which a jury can conclude that more likely than not, but for defendant's conduct, the plaintiff's injuries would not have occurred." 301 Kan. at 623. To prove legal causation, the plaintiff must show "it was foreseeable that the defendant's conduct might create a risk of harm to the victim and that the result of that conduct and contributing causes was foreseeable." 301 Kan. at 623.

In order to meet her requisite burden of proof in opposing the motion for summary judgment, Crouch needed to produce testimony by a "qualified medical expert" who offered their opinion that Dr. Smith "either did not possess the requisite degree of

learning and skill or failed to use reasonable care and diligence in applying such learning and skill to the treatment of the patient." *Sharples*, 249 Kan. at 295-96. Medical expert testimony is required not only to prove that the doctor's treatment fell below the standard of care, but also to prove the element of causation—that is, that such treatment caused the injury alleged. 249 Kan. at 296. But a limited exception is appropriate in the rare case "where lack of reasonable care or existence of proximate cause is apparent to an average layperson from common knowledge or experience." *Biglow v. Eidenberg*, 308 Kan. 873, 887-88, 424 P.3d 515 (2018); see *Acord v. Porter*, 58 Kan. App. 2d 747, Syl. ¶ 8, 475 P.3d 665 (2020), *rev. denied* 312 Kan. 890 (2021).

Crouch argues on appeal that "[t]his was not a complex issue. Either the plaintiff had expert opinion evidence that Dr. Smith violated the standard of care or did not." But Crouch's argument is oversimplified and misses the crux of the district court's ruling on this issue—the court found that while Piontek's expert report included some language that Smith deviated from the standard of care, the report included "no clear indication of causation."

Crouch's medical malpractice claim was based on allegations that Dr. Smith did not adequately advise Crouch of her alternative treatment options outside of the open reduction and internal fixation surgery; placed the metal hardware such that screw tips were protruding out of Crouch's bone; abandoned Crouch's care without giving her adequate notice to find a new doctor; and concealed from Crouch the fact that screws were protruding from her bone, which thus "delayed proper treatment and contributed to the arthritic change and current immobility" she later suffered.

Dr. Piontek's expert report did not provide evidence to support each of these contentions. Instead, the report provided a different explanation for what actions Dr. Piontek believed fell below the appropriate standard of care in this case. The report stated:

"Ms. Crouch's fracture could have, and should have been treated non operatively. The best result, and best chance for healing would have been with nonoperative treatment. The decision to operate led to further disruption and displacement of the fracture fragments, potential disruption of blood supply to the fragments, and problems related to hardware position. There is no clear evidence that Ms. Crouch was informed of the intraarticular penetration of the screws in a timely fashion. Nor is it clear that she was informed of the deterioration of the alignment and fixation in a timely fashion. Dr. Smith's operative treatment of Ms. Crouch was the sole cause in requiring her to have further surgeries, including Reverse Total Shoulder Replacement, and to undergo a prolonged and painful rehabilitation and recovery process. Her treatment, and the lack of the timely provision of information to her by Dr. Smith, represent clear violations of the Standard of Care."

Thus, Dr. Piontek stated that Dr. Smith deviated from the standard of care in the "treatment" of Crouch, especially in the failure to discuss the penetration of the screws from the joint, or the risks of that penetration, in a timely manner. Dr. Piontek explained that "the decision to operate" caused Crouch's injuries (that is, but for the surgery, those injuries would not have occurred). And Dr. Piontek opined that he believed that Crouch should have been treated nonoperatively.

But as the district court observed, though Dr. Piontek disagreed with the treatment choice, he never stated that Dr. Smith's decision to operate on Crouch rather than treat in some different way fell below the appropriate standard of care. In other words, while Dr. Piontek's report noted other alleged deficiencies, it provided no analysis or information to demonstrate that the decision to go forward with surgery was negligent. In fact, his report noted that in the days before the surgery, Dr. Smith met with Crouch, ordered and reviewed a CT scan, and discussed surgical and nonsurgical treatment options (including the risks associated with surgery). Crouch opted to move forward with the surgical treatment.

21

Indeed, the deviations from the standard of care noted in Dr. Piontek's report (the delay in discussing the screw penetration or discussing how Crouch's shoulder was not healing as expected) came *after* the operation—which Dr. Piontek states was the "sole cause" of her injuries. Accord *Hare v. Wendler*, 263 Kan. 434, 441, 949 P.2d 1141 (1997) (affirming summary judgment when the expert opined "that defendant physician had departed from the acceptable standard of care, [but] he could not say that the departure caused or contributed to the injury").

Apparently recognizing these deficiencies, Crouch argued before the district court that Smith performed "in a manner so obviously negligent that liability would be plain to a reasonable juror without the aid of specialized knowledge." But while courts have recognized a limited exception to the requirement for expert testimony in some medical malpractice cases, "application of the common knowledge exception is extremely limited." *Munoz v. Clark*, 41 Kan. App. 2d 56, 62, 199 P.3d 1283, *rev. denied* 289 Kan. 1279 (2009); see e.g., *McKnight v. St. Francis Hosp. & School of Nursing*, 224 Kan. 632, 632-35, 585 P.2d 984 (1978) (applying exception when weakened patient fell onto the floor from an examination table that was tilted vertically); *Bernsden v. Johnson*, 174 Kan. 230, 238, 255 P.2d 1033 (1953) (applying exception when patient suffered choking caused by metal disc lodged in patient's throat after surgery); *Schwartz v. Abay*, 26 Kan. App. 2d 707, 711, 995 P.2d 878 (1999) (applying exception where surgeon removed 60% of the wrong vertebral disc).

In contrast, our appellate courts have declined to extend the common-knowledge exception when the question turns on a treatment that involves "great skill and professional training." *Munoz*, 41 Kan. App. 2d at 63. For example, the Kansas Supreme Court held that the common-knowledge exception was not applicable when the "appropriate treatment of tracheal stenosis is not within the experience, education, or everyday knowledge of the average juror." *Schlaikjer v. Kaplan*, 296 Kan. 456, 464, 293 P.3d 155 (2013). And this court in *Munoz* found that the common-knowledge exception

would be inappropriate for a case involving laparoscopic surgery—a type of surgery that was practiced by specially trained surgeons—and "[w]hat must be done—peering into a television monitor, trying to identify various tissues and organs, distinguishing healthy tissue from diseased, and attempting to remove the diseased by making small subtle movements with tiny instruments—requires skills and knowledge beyond common knowledge and experience." 41 Kan. App. 2d at 63.

This analysis also applies to the open reduction and internal fixation surgery Dr. Smith performed on Crouch, which required Dr. Smith to make an incision, realign the bone, and place metal hardware to hold the bone fragments in place, along with the decision as to whether surgery or some other treatment option is reasonable for a patient. It is not common knowledge whether this surgery was appropriate for Crouch's situation. Under these circumstances, the district court was correct in holding that Crouch was required to provide expert testimony to opine on causation.

In sum, our review of the record and the parties' arguments shows that Crouch has not made a prima facie showing that any alleged breach of the standard of care by Dr. Smith caused Crouch's injuries. Because the facts as set out on summary judgment demonstrate that Crouch failed to establish causation—an essential element of her medical-malpractice claim—the district court correctly granted summary judgment to Dr. Smith. See *Drouhard-Nordhus*, 301 Kan. at 627.

Crouch's brief takes issue with several other aspects of the district court's statements regarding the expert report, such as comments questioning Dr. Piontek's qualifications as an expert and the general admissibility of the report. But the district court's causation analysis presumed that the expert report was properly qualified and admissible. Thus, it is unnecessary for us to discuss those remaining arguments here. See *State v. Montgomery*, 295 Kan. 837, 840, 286 P.3d 866 (2012) (Kansas courts do not issue advisory opinions.).

Our review of the record shows that Crouch failed to come forward with evidence from a qualified expert showing that any alleged deviation from the standard of care by Dr. Smith caused her injuries. We therefore affirm the district court's grant of summary judgment for the defense.

Affirmed.